561 A.2d 762

**In the Interest of Ronald James COAST and Melissa Jane Coast, Minors. (Two Cases)**

**Appeal of James and Sarah COAST, the Natural Parents. (Two Cases)**

Superior Court of Pennsylvania.

Argued Feb. 27, 1989.

Filed June 27, 1989.

452

Anthony Piatek, New Castle, for appellants.

David Henderson, New Castle, for appellees.

Sydney W. Paul, New Castle, for Children Services, participating party.

Before CIRILLO, President Judge, and CAVANAUGH, BROSKY, McEWEN, OLSZEWSKI, BECK, TAMILIA, POPOVICH and JOHNSON, JJ.

JOHNSON, Judge:

This is an appeal from the final decree terminating the parental rights of appellants James R. Coast and Sara Jane Coast and the final decree denying the Coasts visitation with their two children, Ronald James Coast, born February 23, 1973, and Melissa Jane Coast, born November 21, 1974. We are asked to decide whether a "best interests of the child" balancing test is appropriate in a termination proceeding, and, if it is not, whether the trial court erroneously applied such a test. In addition, the Coasts challenge whether the record supports the trial court's conclusion on both the termination and the visitation issues. Finding that

the trial court did not apply a "best interests" standard, which would have been inappropriate for this determination of whether the parents were unable or unwilling to provide for the children's needs and welfare, and finding that the record supports the trial court's decision to terminate parental rights and the trial court's previous decision to deny visitation, we affirm.

## I.

The root of the disruption of the Coast family home is the alcohol problem of both parents. This has led to the Coasts' abdication of their parental roles; they have ceased to provide for their children both physically and emotionally. Ronnie is retarded and requires special care. Melissa has had pervasive emotional problems because her parents have neglected her. Originally the Coasts lived in Butler County, where, as early as 1979, Children and Youth Services (CYS) had received reports from the police regarding the couple's marital disputes. Butler County CYS removed the children for a 16 month period, until the spring of 1981, due to unsatisfactory home conditions. The children were again removed for a four-month period in 1981–82 upon a finding that the condition of the home was unsanitary, and that the parents were walking out on each other and leaving the children unsupervised.

The family then relocated to Lawrence County, where in April of 1984 CYS was notified by the school district in which the children were enrolled that their attendance was extremely poor. Upon investigation, the children were found at home unsupervised. CYS again determined that the home was unsuitable, and the children were removed, placed into foster homes and were adjudicated dependent pursuant to the Juvenile Act, 42 Pa.C.S. §§ 6302[1] and 6341(c) on April 23, 1984. The children had structured

---

1. "Dependent Child." A child who:
 (1) is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental or emotional health, or morals;
 42 Pa.C.S. § 6302.

visits with their parents until March 13, 1986, when it was determined that the visits upset the children to the extent that their behavior regressed for weeks afterward. On this date CYS filed a petition to terminate the Coasts' parental rights, and all visitation was halted. Hearings on the petition were held on July 16 and December 23, 1986. The children were represented throughout the proceedings by their own counsel.

The Coasts began treatment for their alcoholism at the Irene Stacy Health Center in Butler in 1985; they had been in treatment for eighteen months at the time of the termination hearing. At the termination hearing the court heard conflicting testimony; the Coasts' therapist testified that the couple told him that they had not been drinking, and yet Melissa testified that she smelled alcohol on her mother's breath during a visit within this period. Following Melissa's testimony, the court conducted an in camera examination of Melissa, with all counsel present. Melissa testified that she was afraid to return to her parents because she feared that they would resume their former drinking habits and would again neglect her. The psychologist for the Human Services Center, who had conducted a parenting evaluation of the Coasts, testified that the Coasts had made little progress since 1979 when the children were first taken from them and that therefore his prognosis was guarded concerning whether the Coasts could care for the children in the future.

Also testifying was Christine Kidd, the 19-year-old daughter of Mrs. Coast. Christine testified at the first hearing that her parents had made considerable progress and had stopped drinking. However, after that hearing but before the trial court reached a decision, Christine repudiated her testimony. Therefore, upon petition by CYS, the court ordered another hearing, which was held on December 23, 1986. At this second hearing Christine testified that her parents were having considerable trouble managing their household, which now included Mrs. Coast's 17-year-old daughter Cindy, who had also been in foster care but

had been returned to the Coast's home, and two infant children of Sarah Coast's oldest daughter, Mary Ann. Christine testified that, because of her mother's neglect of Cindy, she now felt the need to take responsibility for her sister, to transport her to school and to buy her clothes and personal items. She also expressed doubts about whether her parents had, in fact, stopped drinking, because she had often seen them walking home late at night from the area of a bar and had noticed visitors bringing alcohol into their home. The court also heard extensive testimony from several social workers and counselors who had been involved with the Coast family case over long periods of time. The court found that the implication of this testimony was that conditions in the Coast home were unlikely to change. On that same day, December 23, 1986, the court denied the Coasts visitation.

On July 31, 1987 the Honorable Glenn McCracken, Jr. filed the Adjudication and Decree Nisi terminating the Coasts' parental rights. The decree incorporated the prior denial of visitation on the grounds that visitation presented a clear and present danger to the welfare of the children. The decree also provided for custody to remain with CYS, which had placed the children with the foster families that now seek to adopt the children. On August 10, 1987, the Coasts filed separate petitions asking the court to reverse its decision on visitation and on termination. In his opinion accompanying the denial of the petition to reverse the denial of visitation, Judge McCracken outlined the facts that led him to conclude that both children were terrified of their parents and that they both visibly regressed for a time after the visits. Melissa had, in fact, told the social worker, at the time of the visitation hearing when she was 13 years of age, that she did not want to return to her parents. The court also noted that, although both parents and their counsel were present at the hearing, no evidence was offered in their favor.

Again on November 12, 1987 the Coasts filed a motion to modify and reverse the visitation decision, which was de-

nied. Following this, the Coasts filed Exceptions to the court order denying visitation. The exceptions were dismissed by the trial court on April 6, 1988. Notice of appeal to this court was filed on May 5, 1988 from the termination of parental rights and on May 16, 1988 from the denial of visitation. On June 10th, 1988 this Court ordered the entering of a final decree in both actions, which were entered on June 28, 1988. A panel of this court decided the case in an Opinion filed on December 15, 1988 that was subsequently withdrawn. Because other cases from this Court refer to "the child's best interests" when reviewing an order terminating parental rights, the panel certified these appeals to the Court en banc to allow us to determine the role, if any, of the "best interests" balancing analysis in a termination of parental rights proceeding.

## II.

On appeal the Coasts argue that the trial court, in deciding whether the statutory requirements for termination were present, improperly weighed the environment that they themselves could provide to their children against the environment of the potential adoptive homes. The Coasts are joined by counsel for the children in this argument. As we determine, such a "best interests" balancing analysis is improper, and the trial court in fact took great care not to engage in such an analysis. While it is true that the court considered a wide range of testimony, a thorough review of the record, the Adjudication and the well-reasoned opinion of the Honorable Glenn McCracken, Jr. refutes the Coasts' contention that the court employed a best interests standard in deciding to terminate their parental rights.

The court never discussed the foster homes. Rather, the trial court based its decision to terminate the Coasts' parental rights upon the correct legal standard as set forth in 23 Pa.C.S. § 2511. This determination was reached only after the trial court conducted a commendably exhaustive and exemplary inquiry into all the ramifications of this sensitive case. Once the trial court found that the requisites of

termination were met, it then decided to terminate parental rights. No issue was raised that additional factors existed that would render termination adverse to the children's interests, nor did the trial court address any.

Judge Tamilia, in his scholarly Concurring and Dissenting Opinion, explains in great detail that, should the court find that the statutory requirements of termination—that the parents cannot or will not provide for the child's needs and welfare—are met, the court, in light of additional factors, still has the power not to terminate parental rights. It is this consideration of additional factors that Judge Tamilia defines as consideration of the child's best interests. We do not quarrel with this proposition, nor do we now conclude that consideration of the child's best interests, thus defined, is forever foreclosed, or that termination *must* be decreed once findings are legally conclusive. Rather, we focus our discussion on the issue raised by the Coasts, whether the trial court improperly balanced the virtues of two homes in deciding that the statutory requisites of termination were met. Thus, our respective positions each actually speak to different issues in termination proceedings. Given the facts of this case and the scope of the issue before us on appeal arising out of these facts, we found it neither necessary nor expedient to reach the issue that Judge Tamilia so ably examines.

██ First, the Coasts are correct in asserting that a best interests balancing analysis has no place in a determination of whether the statutory requisites of termination of parental rights have been met. Both the statute and case law confirm the validity of this proposition. Because this question has been an understandable source of confusion, we will set forth how the "best interest" test conflicts with the purpose of a termination action. Initially we will characterize the parent's right with regard to children.

██ The United States Supreme Court explains that a parent's interest in children is a:

> fundamental liberty interest of natural parents in the care, custody, and management of their child [which] does

not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State. Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life.

*Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 1394–1395, 71 L.Ed.2d 599, 606 (1982). The state, too, has an interest in promoting the welfare of the child. However, it should be remembered that this interest favors preservation, not severance, of family bonds; the state's interest in finding the child another home therefore arises only when it is clear that the natural parent cannot or will not provide sufficient care for the child. *Santosky*, 455 U.S. at 766–767, 102 S.Ct at 1401–1402, 71 L.Ed.2d at 615.

■ A termination court's inquiry, then, focuses on whether the parents are capable of performing the parental duties required of them by society. If the parents cannot fulfill these duties, only then must they relinquish the rights of a parent. The *Santosky* court held that, because the parental interest is so fundamental, due process requires the party seeking termination to demonstrate by the standard of clear and convincing evidence that the parent can no longer perform parental duties and is thus not entitled to parental rights. In its discussion of the factfinding process in a termination action, the *Santosky* court explained that:

[t]he factfinding does not purport—and is not intended—to balance the child's interest in a normal family home against the parents' interest in raising the child. *Nor does it purport to determine whether the natural parents or the foster parents would provide the better home.* Rather, the factfinding hearing pits the State directly against the parents.

*Santosky*, 455 U.S. at 759, 102 S.Ct. at 1398, 71 L.Ed.2d at 610 (emphasis added).

This Commonwealth has, by statute and by caselaw, consistently adhered to these principles. Historically, a determination of relinquishment of parental rights without

consent could be made only by establishing abandonment. Abandonment as defined in the 1925 Adoption Act[2] consisted of "conduct on the part of a parent which evidences a settled purpose of relinquishing parental claim to the child and of refusing or failing to perform parental duties." This was a matter largely of the parents' intention, to be determined from the evidence. *In re Gunther's Adoption,* 416 Pa. 237, 206 A.2d 61 (1965).

■ In 1970 the legislature passed a new adoption act which in effect bifurcated adoption proceedings. Act of July 24, 1970. An initial proceeding determined whether parental rights should be extinguished. The act titled this portion of the procedure a "Proceeding Prior to Petition to Adopt." This portion of the Act contained the requirements for voluntary relinquishment of parental rights and involuntary termination of parental rights. If the requirements of one of these sections is met, then the adoption proceeding may take place. Most significant is that the 1970 act introduced new grounds for termination of parental rights. Parental rights could be involuntarily terminated if:

> the repeated and continued incapacity, abuse, neglect, or refusal of the parent has caused the child to be without essential parental care, control, or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect, or refusal cannot or will not be remedied by the parent;

1 Pa.S. § 311(2) (repealed). The Official Comment distinguished this concept from abandonment by explaining that it centered judicial inquiry on the welfare of the child rather than on the fault of the parent. *See* 23 Pa.C.S. § 2511, Comment—1970; *In re Adoption of Michael J.C.,* 506 Pa. 517, 486 A.2d 371 (1984). In other words, the focus shifted from the parents' behavior to the effect of parents' actions or omissions upon the child. The parents' behavior still constitutes the operational fact, but in a broader sense. This effect upon the child has subsequently been expressed as the "needs and welfare" of the child. It follows, then,

2. Act of April 4, 1925, P.L. 127.

that judicial inquiry necessarily looks at whether the needs of the child, both physical and emotional, are being served, for the purpose of determining whether or not the parent is performing his function. *See Adoption of R.I.*, 468 Pa. 287, 361 A.2d 294 (1976); *cert. denied*, 429 U.S. 1032, 97 S.Ct. 722, 50 L.Ed.2d 743 (1977).

In this sense, the child's welfare is and always has been considered in Pennsylvania, and "the welfare of the child is of paramount importance in adoption matters." *In re Adoption of List*, 418 Pa. 503, 515, 211 A.2d 870, 877 (1965) (decided under the 1925 Act). Our courts never meant by this kind of language that a "best interests of the child" balancing test was to be employed; the analysis has, rather, always been an intensive factfinding inquiry into whether the statutory provisions for termination had been met. A best interest of the child analysis, employed traditionally in custody proceedings between two parents, *is* a balancing of the relative virtues of the two homes in question. It is a presumption in a best interests analysis that the parents, as adverse parties in a custody action, have equal rights regarding the subject child, the question for the court being to determine which home is better for the child. The focus and purpose of a termination hearing, in contrast, is whether parents have so failed in their duty that the State, because of its interest in the child's well-being, must strip the parents of their fundamental right.

A consistent line of cases has elaborated upon this point, beginning with *In Re Schwab's Adoption*, 355 Pa. 534, 50 A.2d 504 (1947). The court wrote:

Consideration of what is beneficial for the child is vital in custody cases, but cannot be regarded as evidence of abandonment. The child's happiness and well being is the paramount consideration in *custody cases*. Under the Adoption Act the welfare of the child is weighed only *after* the necessary consents have already been given or forfeited.

. . . .

"The fact that the adoption asked for may be advantageous to the children and for their material welfare is not to be considered by the court until the necessary prerequisites for such action exist."

*In Re Schwab's Adoption,* 355 Pa. at 540–541, 50 A.2d at 508 (citations omitted; emphasis in original). Citing *Schwab's Adoption* and subsequent cases, the supreme court wrote in 1975 that "... in the absence of sufficient evidence to satisfy the statutory requirements for involuntary termination, the question of the best interest of the child never arises." *In re Adoption of McAhren,* 460 Pa. 63, 70, 331 A.2d 419, 422 (1975).

In 1980 the legislature amended the Involuntary Termination provision of the Adoption Act of 1970 by adding the underscored sections below. The legislature made no substantive changes in the text of the original language of 1 Pa.S. § 311(1)–(3), now § 2511(a)(1), (2) and (3):

**§ 2511. Grounds for involuntary termination**

**(a) General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

(3) The parent is the presumptive but not the natural father of the child.

*(4) The child is in the custody of an agency, having been found under such circumstances that the identity or whereabouts of the parent is unknown and cannot be ascertained by diligent search and the parent does*

*not claim the child within three months after the child is found.*

*(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.*

*(b) Other considerations.—The court in terminating the rights of a parent shall give primary consideration to the needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.*

23 Pa.C.S. § 2511.

The amendments broadened grounds for termination by requiring that the social agencies take an affirmative role in keeping the family together.[3] The statute does not introduce a new test for termination of parental rights merely by use of the phrase "needs and welfare of the child." In fact, this language conforms to the older cases cited above. The comment to the new section (b) states that:

"Subsection (b) directs the court to give primary consideration to the child's needs and welfare. *See Adoption of R.I.*, 468 Pa. 287, 361 A.2d 294 (1976). Furthermore, the court is directed not to terminate parental rights solely on the basis of environmental factors."

**3.** Social agencies were first recognized as having a role in the termination and adoption process in the Act of April 4, 1925 as amended December 21, 1959, P.L.1955.

Source and Official Comment—1980. Justice Roberts, writing for the *Adoption of R.I.* court, explicitly rejected a balancing approach:

A child cannot be declared 'neglected' merely because his condition might be improved by changing his parents.

*Adoption of R.I.*, 468 Pa. 287, 295, 361 A.2d 294, 298 (1976). This language was excerpted from an opinion of this Court written by Judge Woodside, *In re Rinker*, 180 Pa.Super. 143, 117 A.2d 780 (1955). The complete *Rinker* passage so cogently summarizes the principles under discussion here that it is worth reproducing in its entirety:

The family is an institution which preceded governments. Its sanctity was universally recognized before judges or statutes or constitutions or welfare organizations were known to man. The right of a child to a mother and a mother to a child are rights created by natural law. They are rights attributable to the nature of mankind rather than to the enactments of law.

It is a serious matter for the long arm of the state to reach into a home and snatch a child from its mother. It is a power which a government dedicated to freedom for the individual should exercise with extreme care, and only where the evidence clearly establishes its necessity. *Yet, of course, there are cases where such authority must be exercised for the protection and welfare of children.*

Under our system of government children are not the property of the state to be reared only where and under such conditions as officials deem best. *On the other hand the state is interested in establishing a minimum standard of care for a child's physical, intellectual and moral well being.* But this minimum standard must be viewed in the light of experience. Although there are many very good homes, there is no such thing as a "perfect home."

A child cannot be declared "neglected" merely because his condition might be improved by changing his parents. The welfare of many children might be served by taking them from their homes and placing them in what the

officials may consider a better home. But the Juvenile Court Law was not intended to provide a procedure to take the children of the poor and give them to the rich, nor to take the children of the illiterate and give them to the educated, nor to take the children of the crude and give them to the cultured, nor to take the children of the weak and sickly and give them to the strong and healthy.

*The power of the juvenile court is not to adjudicate what is for the best interests of a child, but to adjudicate whether or not the child is neglected.*

*In re Rinker*, 180 Pa.Super. at 147–148, 117 A.2d at 783–784 (emphasis added). The "minimum standard of care for the child's physical intellectual and moral well-being" amounts to what Judge Woodside termed the "protection and welfare of children" and what the statute terms "the child's needs and welfare." The term "child's needs and welfare" denotes neither a discrete factor which a court must consider, nor a discrete step in a termination adjudication. Rather, it denotes the minimum standard of care that is required of parents by the state. If the standard is not met, the courts must decide that the child is neglected.

The *Adoption of R.I.* court recognized the "child's needs and welfare" standard of care by explicitly relying on key portions of the above-quoted portions of *In re Rinker*, and it also recognized the long-standing principle that the best interests of the child cannot be considered until after a finding that the statutory requirements had been met. *Adoption of R.I.*, 468 Pa. at 299 n. 12, 361 A.2d at 300 n. 12. By incorporating the *Adoption of R.I.* approach, the legislature was clearly *not* adopting a new test for termination of parental rights but rather was reaffirming the approach taken by the courts of this Commonwealth. We reiterate that the language directing the court to give primary consideration to the child's needs and welfare is found in the old cases. *See, e.g., In re Adoption of List, supra.*

In 1984 this Court, sitting en banc, addressed the precise issue of whether, by way of the 1980 amendments, the legislature intended to introduce a radical departure in the

law and change the test for a termination of parental rights determination. We held that the legislature had no such intention. Acknowledging that the "best interests" standard traditionally has been applied to custody disputes, we distinguished "best interests" from "needs and welfare:"

[needs and welfare] denotes certain minimum requirements that all children are entitled to—adequate housing, clothing, food and love—whereas [best interests] connotes a weighing of two adequate but unequal situations (traditionally, the respective households of mother and father). Our supreme court has, in the past, refused to sanction the termination of parental rights where the children are fed and clothed, are in generally good health, and are not abused although the home is "submarginal" and the children might suffer from cultural deprivation.

*In re Adoption of Michael J.C.,* 326 Pa.Super. 143, 159, 473 A.2d 1021, 1029 (1984); *rev'd on other grounds,* 506 Pa. 517, 486 A.2d 371 (1984). We also held that § 2511(b) "does not contain an additional ground for terminating parental rights; such grounds are contained in § 2511(a) only. Thus, until the requirements of § 2511(a) are met, there is no need to consider § 2511(b)." *In re Adoption of Michael J.C.,* 326 Pa.Super. at 159, 473 A.2d at 1030.

■ Most recently, the Pennsylvania Supreme Court has addressed this issue and has come to the same conclusion. In holding that grounds existed for termination of a disabled father's parental rights, the court wrote:

[23 Pa.C.S. § 2511(a)(2)] makes it clear that grounds for termination can consist of lack of capacity and not just affirmative misconduct. Judicial inquiry is to be centered on the best interest of the child, rather than the fault of the parent. *But this is only after the parent's incapacity is proven by clear and convincing evidence. Absent sufficient evidence to satisfy the statutory requirements for involuntary termination, the question of best interests of the child never arises.*

*In re Adoption of J.J.,* 511 Pa. 590, 607, 515 A.2d 883, 892 (1986); *on remand to* 366 Pa.Super. 94, 530 A.2d 908 (1987)

(emphasis added); *see also In re Adoption of Michael J.C.*, 326 Pa.Super. at 159, 473 A.2d at 1026. We conclude that the legislature did not, by the amendments of 1980, intend to bring about a sharp departure from an established precept of the law and permit termination of parental rights, "one of our basic civil rights," *In re Adoption of J.C.*, *supra*, by permitting the "best interests" balancing test.

The Coasts correctly cite to *In re Adoption of A.N.D.*, 360 Pa.Super. 157, 520 A.2d 31 (1986), *appeal denied*, 516 Pa. 638, 533 A.2d 710 (1986) as support for their position that "the best interest of the child, rather than the fault of the parent" does not mandate the application of a "best interests" analysis. Our Court in *A.N.D.* applied the correct analysis. We examined whether the trial court had before it sufficient clear and convincing evidence to warrant its termination of the parent's parental rights pursuant to 23 Pa.C.S. § 2511. Despite dicta at the close of the opinion that best interests must be considered, the *A.N.D.* court demonstrably did not use a best-interests balancing test. This closing dicta insofar as it implies that 23 Pa.C.S. § 2511 requires a best interests balancing analysis is to be disregarded.

Similarly, in *In re Adoption of Hamilton*, 379 Pa.Super. 274, 549 A.2d 1291 (1988), this Court properly conducted an inquiry into whether there was clear and convincing evidence warranting termination of parental rights where a father, following an initial abandonment, evidenced an affirmative demonstration of his intention to assume parental responsibilities toward his daughter. We held that the trial court erred in not evaluating the father's post-abandonment behavior, and that, in effect, his post-abandonment efforts negated the existence of clear and convincing evidence to support termination of his parental rights. However, we included language serving as a buttressing rationale that could be read as suggesting, incorrectly, that the trial court must conduct a "best interests" weighing analysis. As with *A.N.D.*, any such suggestion should be disregarded.

468

■ We will now continue with the disposition of the appeal before us by articulating our standard of review:

In cases where there has been an involuntary termination of parental rights by the Orphan's Court, the scope of appellate review is limited to the determination of whether the decree of termination is supported by competent evidence. (citation omitted). If the decree is adequately supported by competent evidence, and the chancellor's findings are not predicated upon capricious disbelief of competent and credible evidence, the adjudication of the Orphan's Court terminating parental rights will not be disturbed on appeal. (citation omitted). It is established that, in a proceeding to involuntarily terminate parental rights, the burden of proof is upon the party seeking termination to establish by "clear and convincing" evidence" the existence of grounds for doing so. *Santosky v. Kramer, supra.*

*In re Adoption of J.J.,* 511 Pa. at 593–594, 515 A.2d at 885–886. Further, the trial court is the sole judge of credibility, conflicts are to be resolved by the trier of fact, and absent an abuse of discretion, its findings are given the same weight as a jury verdict. *Id.*

■ An exhaustive review of the record and the trial court's adjudication of July 31, 1987, in which Judge McCracken set forth his findings of fact, as well as the Opinion of April 6, 1988, establishes that the court's conclusion was supported by clear and convincing evidence that the Coasts' parental rights should be terminated. The trial court found, pursuant to 23 Pa.C.S. § 2511(a)(5), that:

Lawrence County Children's Services has met its burden of proof. It has shown that the conditions that led to the removal of the children remain substantially unaltered; that the natural parents cannot remedy those conditions within reasonable time despite the services and assistance available to them, and that termination of the parental

rights would best serve the needs and welfare of the children.

Adjudication of July 31, 1987, p. 8.

 The Coasts argue that this conclusion was based on evidence that was erroneously considered by the trial court, evidence that was "best interests" evidence rather than "termination" evidence. All the evidence considered could be relevant to either analysis. None of this evidence carries independent characteristics that place it in one category or the other. There is no way to distinguish evidence that goes to best interests from evidence that goes to determining whether the statutory requirements are met. The trial court fed the evidence into the correct analytical process. To put it another way, viewing the "totality of the circumstances" is entirely proper and is not the same thing as applying a balancing analysis. *See In the Matter of K.L.P.*, 354 Pa.Super. 241, 511 A.2d 852 (1986). Ronnie's retardation and Melissa's emotional problems require special care. The trial court did not determine that foster homes could better provide for these needs, but that the Coasts have repeatedly demonstrated that they cannot provide for even the children's minimal needs.

 In a separate appeal, the Coasts challenge the order denying visitation.[4] In reviewing a trial court's denial of visitation, we look to whether there exists clear and convincing evidence that visitation would present a grave threat to

---

**4.** Although Pa.R.C.P. 1915.10 states that no motion for post trial relief may be filed on visitation issues, in this case the court issued a decree nisi, which required the filing of exceptions in order for the Coasts to preserve their appeal rights. Most important, throughout the process of this determination, both the termination and the visitation issues were properly handled as one case, in one set of proceedings. We do not believe that the rule should be applied to deny appellate review under these circumstances. Therefore, the filing of exceptions on the visitation issue will not work to defeat appellate review, either with regard to propriety of the motions themselves or with their effect on the timing of filing an appeal to this Court. *See Palladino v. Dunn*, 361 Pa.Super. 99, 521 A.2d 946 (1987); *Storti v. Minnesota Mutual Life Insurance Company*, 331 Pa.Super. 26, 479 A.2d 1061 (1984). Our review of the record satisfies us that the trial court's order denying visitation had no adverse impact on the rights of the Coasts in the termination issue.

the child. *In Interest of Rhine*, 310 Pa.Super. 275, 456 A.2d 608 (1983). When making this determination, we must take into consideration the express legislative policy of preservation of the family. *See* the Juvenile Act, 42 Pa.C.S. § 6301 *et seq.* Therefore, the trial court is required to consider options such as structured visitation with the aid of an agency; only where there are no practicable visitation options can visitation be denied. *In Interest of Rhine*, *supra.* Thus, the standard to apply to visitation cases comports with that to be applied in termination cases; the "best interests" standard is not the correct principle to apply to either. *In re Adoption of Michael J.C.*, 326 Pa.Super. 143, 473 A.2d 1021 (1984).

▇ The record in this case establishes that the trial court considered and implemented visitation options. Following the adjudication of dependency and the removal of the children from the Coasts' home, the court permitted structured visitation with the aid of CYS over a two year period. Only after both children evidenced marked ill effects from these visits did the court deny visitation. In the opinion accompanying the order denying visitation, Judge McCracken diligently summarized the facts which led him to conclude that there was:

> clear and convincing evidence that visits with the parents would present a grave threat to the emotional, mental, physical and psychological welfare of both children which cannot be remedied by a structured or supervised setting.

Opinion, November 2, 1987, pp. 3–4. We do not agree with the Coasts that the evidence before the trial court consisted of speculation and unsupported facts. Conflicts in testimony were properly resolved by the trial court. After our own close review of the testimony, we conclude that the trial court was correct. Thus, we affirm the denial of visitation.

Where the trial court so carefully and thoroughly performs its factfinding function, absent an error of law, and where the court's determinations of credibility leads to the conclusion that parental rights should be terminated and

that visitation should be denied, we will affirm the trial court's decisions.

Orders affirmed.

BECK, J., files a concurring opinion.

TAMILIA, J., files a concurring and dissenting opinion in which OLSZEWSKI, J., joins.

BROSKY, J., files a dissenting opinion, in which CIRILLO, P.J., joins.

BROSKY, Judge, dissenting:

I concur in Part II of the majority's analysis. I wholeheartedly agree that: (1) unless the criteria of 23 Pa.C.S. § 2511(a) are met, § 2511(b) does not come into play; and (2) "needs and welfare" are not to be equated with "best interests", despite any suggestion to the contrary in *In re Adoption of A.N.D.*, 360 Pa.Super. 157, 520 A.2d 31 (1986).

It is here, however, that I part company with the majority, as I am vehemently opposed to affirmance of the court's termination of the Coasts' parental rights, and concomitant denial of visitation.

The standard of review in a proceeding which terminates parental rights is limited to determining whether the trial court's finding of a clear necessity for termination of parental rights is supported by competent evidence. *In re Adoption of M.M.*, 492 Pa. 457, 424 A.2d 1280 (1981); *Interest of LaRue*, 244 Pa.Super. 218, 366 A.2d 1271 (1976). Although an appellate court may not reweigh credibility, *Adoption of S.H.*, 476 Pa. 608, 383 A.2d 529 (1978), the trial court's inferences, deductions and conclusions are subject to review. *Matter of M.L.W.*, 307 Pa.Super. 29, 452 A.2d 1021 (1982).

One of appellants' contentions is that the trial court erroneously considered the "best interests" of the children, rather than concentrating upon those factors necessary to terminate rights, as delineated in § 2511(a), and that the court, therefore, terminated rights on evidence that was

less than "clear and convincing". My review of the record convinces me that appellants are correct.

The court relied upon such factors as the children's progress in school, their progress in the foster home, and the reluctance of one of the children to return home. My disagreement does not lie with the consideration of this evidence; however, the conclusions drawn therefrom are more consistent with a "best interests" analysis than with a finding that "needs and welfare" are not being met. Even those witnesses testifying adversely to appellants' interests and in favor of termination, conceded that improvements are being made in both the housing situation and in appellants' alcohol problems. None of these witnesses could positively say, furthermore, that the children's needs are not being met in this "improved state".

It is at this point that the distinction outlined in *In re Adoption of Michael J.C.*, supra. becomes critical. While the "best interests" may indeed tip the scales in favor of terminating appellants' rights, the "needs and welfare"— i.e. adequate housing, clothing, food, and love—would dictate a different result. The trial court found that the conditions giving rise to the removal of the children could not or would not be remedied by appellants. The court acknowledged that appellants are trying to make the necessary improvements, but felt that, in the absence of an indication that the adverse conditions would not recur, termination was proper. (Trial Court Opinion, Page 12). That, however, is not the criteria for terminating a parent's rights. *See*, 23 Pa.C.S.A. § 2511. Additionally, the court made reference to the fact that appellants are currently caring for one teenage daughter and two small grandchildren, as being a negative factor. However, there was no indication in the record that any of these children are poorly cared for. In fact, there is testimony that they are indeed *well* taken care of. (Notes of Testimony, 12/23/86 pp. 41–42).

Finally, the court found "no clear evidence that these parents have corrected or are correcting their problem with

alcohol, but there was credible evidence that they had not yet achieved sobriety." (Trial Court Opinion, Page 13). This, however, is belied by the testimony of appellants' alcohol counselor. His testimony, in part, is as follows:

Q. Mr. Heaney, you have seen the Coasts for a long period of time, correct?

A. Yes, I have.

Q. In your opinion, to make it clear, have they progressed in your mind?

A. It appears they have. Again, I don't know for certain whether they have maintained their sobriety without being able to test for it. However, as is generally the rule in alcohol or in alcoholism, there is a progression if you are continuing your drinking and that did not appear to me.

Q. So, you have no reason to disbelieve them when they tell you the fact that they have not taken any alcoholic beverages?

A. I have not seen any evidence that they have.

Q. In fact, apparently the evidence is contrary?

A. Correct.

. . . . .

(Notes of Testimony, 7/16/86, pp. 58–59).

Q. You have no reason to disbelieve them when they say they have abstained since November of '85?

A. Yes, Your Honor.

Q. You do not disbelieve that?

A. I hold it—I suppose I have become synical [sic] from my experience. I hold it with a little grain of salt. But at the same time, I would have expected to see more evidence of use and abuse had they been drinking.

Q. And that evidence is lacking?

A. Yes, Your Honor.

(Notes of Testimony, 7/16/86, Page 64). Thus, credibility aside, the record does not support all of the trial court's findings. *See, In re Adoption of M.M.*, supra, and *Matter of M.L.W.*, supra. Because of the importance placed on the

family, the Commonwealth may disrupt the parent-child relationship only upon a showing of clear necessity. *In re Interest of C.M.E.,* 301 Pa.Super. 579, 448 A.2d 59 (1982). Such is lacking in the instant case.

The majority attaches particular significance to the special needs of these children, noting Ronnie's retardation and Melissa's emotional problems. I am wary, however, of the majority's affirmance of the termination of rights because of the "totality of the circumstances". As noted above, the evidence is neither clear nor convincing that these special needs are not being met, but rather, supports only that these needs *might* be better met by alternative care. I cannot condone such "best interests" analysis in a termination setting. The implications of such thinking are clearly dangerous, and set precedent whereby parents who are not ideally suited to deal with physically, mentally, or emotionally handicapped children, might find their parental rights terminated in favor of those better equipped, emotionally, financially, or otherwise, to handle special problems. I do not believe the legislature intended to open the door to such possibilities, and I shall not agree to opening that door by joining in the affirmance of termination.

I would therefore reverse the order terminating parental rights.

Turning now to the issue of visitation, our scope of review is limited to determining whether the trial court's finding that visitation, even structured visitation, would be a grave threat to the welfare of the children, is supported by competent evidence.

The principle question that we need to consider is what standard should be applied by the courts when considering the evidence in visitation cases. Once the standard is established, the evidence can be weighed accordingly.

As does the majority, I believe a good place to begin is the case of *In the Interest of Rhine,*[1] 310 Pa.Super. 275, 456

1. The lower court, in its opinion states that, where the stated purpose of the Juvenile Act is to preserve the family, that purpose no longer exists once the parent's rights have been terminated. Thus, the court

A.2d 608 (1983) which provides: "The (Juvenile) Act does not contain any references to visitation and, ipso facto, does not offer any guidelines for granting or refusing visitation. However, because the allowance of visitation imports with the Act's express purpose of preserving the family, parental visitation should be denied only under exceptional circumstances." Id. 456 A.2d at 613. Further, the Superior Court stated: "Unless the state demonstrates with clear and convincing evidence that even supervised visitation would severely endanger the child, the court must deny the complete foreclosure of parental visitation as being contrary to the Act's goal of family preservation". Id. at 614.

In *In re Adoption of Michael J.C.*, supra., this Court also stated that:

> Where the issue is visitation, or partial custody which closely resembles visitation, a stricter standard prevails: that is, visitation can be denied only if the parent possesses such severe mental or moral deficiencies as to constitute a grave threat to the welfare of the child. *Scott v. Scott*, 240 Pa.Super. 65, 368 A.2d 288 (1976); *Commonwealth ex rel. Turner v. Strange*, 179 Pa.Super. 83, 115 A.2d 885 (1955).

*Michael J.C.*, supra. 326 Pa.Super. at 158, 473 A.2d at 1029. In *Rhine*, supra, this court held that:

> [c]onsistent with the Act's "clear necessity" custody test, parents whose visitation is opposed by the state constitute a grave threat to their child only where there are no practicable visitation options that permit visitation and protect the child.

*Rhine*, supra. 310 Pa.Super. at 285, 456 A.2d at 614. In the past, visitation was held, including home visitation. While I cannot say that home visitation would be the *most* appropriate form of visitation at the moment, I do not believe that *some* type of visitation cannot be worked out to allow for the rebuilding of ties between parents and children.

found it at least questionable, whether the demanding standard of *Rhine* should apply. The court continued with its analysis assuming that *Rhine* did apply. I would reverse the termination order. Thus, the applicability of *Rhine* is no longer in question.

This court has further held that the "best interests" standard is not the correct principle to apply to visitation cases. *In re Adoption of Michael J.C.*, supra.; *In re Damon B.*, 314 Pa.Super. 391, 460 A.2d 1196 (1983). Instantly, as noted above, the court focused on factors such as the children's performance in school, the attitude improvement since being placed in a foster home and their reluctance to see or visit with their parents. By focusing on these factors, the court, again, interpreted the evidence, and based its decision, upon the "best interests" standard. Many additional factors must be considered, such as, and most importantly, the preservation of the family relationship, before all contact between the children and the natural parents (appellants) can be terminated. (See discussion, supra., at page 475).

Since it is established that it is not the "best interests" standard that must be applied, as stated in *In re Adoption of Michael J.C.*, the court's interpretation of the evidence was faulty in regard to the determination as to whether visitation would pose a grave threat to the children.

In the instant case, appellants have shown a continuing resolve to regain their children, or at the very least, to regain visitation rights with the children. Appellants have strived to improve their situation at home and they have, by their own testimony and that of an alcohol counselor, been successfully controlling their alcohol patterns for the past two years. Furthermore, as stated earlier, appellants are currently caring for one teenage daughter and two small grandchildren and there is evidence presented that shows that these children are being well taken care of.

In the instant case, appellants have made great efforts to change their lives and their situation in hopes of regaining their visitation rights and without evidence that shows a clear necessity to terminate the visitation rights, the rights can not be terminated. In this case, the clear necessity has not been shown by the state and, because of the compelling state interest in preserving the family relationship, I would also reverse the decision to terminate appellants' visitation

rights. I would remand so that a schedule of visitation could be instituted, monitored, and enforced. I would so order with the intent that a relationship could, once again, be established between appellants and their minor children.

In light of the foregoing, I respectfully dissent.

CIRILLO, P.J., joins BROSKY, J.

BECK, Judge, concurring:

I concur in the result.

This case seeks to define the term needs and welfare of the child and to clarify the procedure under which the trial court considers the needs and welfare of the child where the court has before it a petition to terminate involuntarily parental rights. Pa.Stat.Ann. tit. 23, § 2511 (Purdon Supp. 1988).

The majority correctly concludes that there is no bright line definition of needs and welfare, and properly notes that the definition of needs and welfare does not and should not encompass the traditional balancing equation associated with the term best interest of the child as used in the context of a custody dispute.

Section 2511 is entitled "Grounds for involuntary termination." The section is divided into two subsections: (a), the General rule, is subdivided into five paragraphs, each covering different grounds for involuntarily termination; and (b), "Other considerations," which provides as follows:

(b) Other considerations. The court in terminating the rights of a parent shall give *primary consideration to the needs and welfare of the child.* The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. (emphasis added).

Subsection (a) does not refer to needs and welfare except in paragraph (5). We, therefore, have an interesting configuration of the needs and welfare language. Subsection (b) including needs and welfare language is applicable to sub-

section (a) and subsection (a) needs and welfare language is found only in paragraph (5). In other words, paragraph (5) requires a consideration of needs and welfare twice; once in (a)(5) to determine the initial statutory requisite and if those statutory requisites are satisfied, again under subsection (b).

Paragraph (5) of subsection (a) in setting forth grounds for involuntary termination provides:

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and *termination of the parental rights would best serve the needs and welfare of the child.* (emphasis added).

Initially, we note that the petitioner relied on grounds found in paragraphs (a)(2) [1] and (a)(5) of 23 Pa.C.S.A. § 2511. Paragraph (2) does not provide for a consideration of needs and welfare while paragraph (5) does. I agree with the majority's analysis of paragraph (a)(2); that the needs and welfare standard of subsection (b) becomes relevant only after the statutory mandate of paragraph (a)(2) have been met. However, I disagree with the majority's analysis of paragraph (5) because the majority ignores the needs and welfare language of paragraph (5) which makes consideration of needs and welfare part of the initial statutory requirements.

I would interpret paragraph (5) as requiring the trial court to:

---

1. (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control of subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

1. Determine whether the conditions which led to the removal continue to exist;

2. Determine whether the parent cannot or will not remedy the conditions within a reasonable time;

3. Determine whether the services or assistance reasonably available to the parent are not likely to remedy the condition which led to the removal or placement of the child within a reasonable time; and

4. Determine whether termination of the parental rights will serve the needs and welfare of the child.

I conclude that the reason the legislature included the needs and welfare language in paragraph (5) is because a paragraph (5) petition requires more intense scrutiny by the court than a petition brought under paragraphs (1) through (4). Paragraph (5) parents are ones whose children have already been removed by the state or who have voluntarily ceded their children to the state. Under these circumstances one can assume that prior to the state's filing the petition for termination the state has had significant contact with the family and its intrusion into the family's life has been substantial. A situation exists where the power of the state has been already pitted against the family. Given the significant involvement of the state upon paragraph (5) parents the legislature directs that before the statutory requirements of subsection (a) are satisfied the needs and welfare of the child must be considered. This directive places the trial court in the position of putting the brakes on termination of parental rights at an earlier stage of its analysis.

Needs and welfare is not a concept that fosters parental termination. It is a concept that inhibits it. The general scheme of the statute provides that even if all of the statutory requirements are satisfied, the parents' rights cannot be terminated without the court's concluding that termination will serve the needs and welfare of the child. Suppose for example that the state has removed a 12–year old child from his home. The state agency brings a timely petition for termination of parental rights. The court finds

that the situation which caused the removal will never be cured, and therefore the requirements of paragraph (5) are met with the exception of a consideration of the needs and welfare of the child. If the child has siblings in different foster homes, termination will cut him off from contact with them. Under these circumstances, the court might determine that the needs and welfare of the 12–year old child will not be served by termination because continued contact with his siblings and with his family, however fragmented, is desirable. Therefore, considering the needs and welfare of the child, the judge will deny the petition to terminate parental rights.

The question naturally arises of what the legislature meant by directing that needs and welfare of the child be first considered under paragraph (5) and then reconsidered under subsection (b). Subsection (b) is applicable to all five paragraphs of subsection (a). As to paragraph (5), because of the significant state intrusion, I conclude that the legislature directed the trial court first to consider needs and welfare as an initial statutory requirement and then, if the statutory requirement under paragraph (5) is satisfied, to reconsider the child's needs and welfare under subsection (b). As the state involvement under subsections (a)(1) through (4) is not as intrusive as under paragraph (5), then consideration of needs and welfare are undertaken only after the statutory requirements under subsection (a) are satisfied.

I agree with the majority that in considering needs and welfare, balancing of interests as used in the custody context is totally inappropriate. I emphasize that the rationale behind needs and welfare is to inhibit termination of parental rights, so that parental rights will not be terminated merely because the statutory requirements of subsection (a) are satisfied.

It is difficult to state with precision the meaning of needs and welfare, and clearly to distinguish that phrase from best interests. As a matter of fact, the Supreme Court of Pennsylvania has used the phrase best interests in connec-

tion with termination of parental rights. *See In re: Adoption of J.J.*, 511 Pa. 590, 607, 515 A.2d 883, 892 (1986) ("Judicial inquiry is to be centered on the best interest of the child, rather than the fault of the parent."); *In re: Adoption of R.I.*, 468 Pa. 287, 298–299, 361 A.2d 294, 300 (1976) (Best interests of child cannot be considered until the statutory requirements for termination have been met.) Where the phrase best interest has been used in prior cases, no case has contemplated a balancing of the pre-adoptive and post-adoptive circumstances.

TAMILIA, Judge, concurring and dissenting:

I concur in the result which affirms the appeal denying visitation by the parents as the trial court made a proper determination based on the evidence that continued visitation would be harmful to the children and therefore would be contrary to their best interest. Having made a finding that termination of parental rights was in order, rights of visitation would thereby be terminated—independently of the trial court's finding on the harmful effect of visitation. *See Adoption of Harvey*, 375 Pa. 1, 99 A.2d 276 (1953) (parents lose all right to possession and custody after termination proceedings).

I respectfully dissent to the majority's analysis of section 2511 of the termination section as it relates to the concept of best interest, as being misleading and incorporating tangential concepts not intended by the Adoption Code.

The majority states at page 7 that best interest of the child does not become a consideration in a termination proceeding during the initial inquiry and that this case does not speak to that issue. It points to several cases for that conclusion and in attempting to do so, severely limits the meaning of those cases and the role of best interest which in reality, for purposes of termination proceedings, has inherent validity.

The majority is correct in stating that a best interest analysis *as between two parents*, is a weighing ("balancing" in the majority) process of the relative virtues of

the two homes in question.[1] It does not fulfill the same function in a termination proceeding and, as such, is not an element in the *initial determination* that must be made by the trial court in such a proceeding. Where the majority goes astray is in attempting to strike distinctions between a child custody action and a termination proceeding when in fact this does not sharpen the analysis, referring to *In Re Schwab's Adoption*, 355 Pa. 534, 50 A.2d 504 (1947), and *In re Adoption of McAhren*, 460 Pa. 63, 331 A.2d 419 (1975), "in the absence of sufficient evidence to satisfy the statutory requirements for involuntary termination, the question of the best interest of the child never arises." *Id.*, 460 Pa. at 70, 331 A.2d at 422. Unquestionably this is a correct statement of the law, but it does not mean that the issue of what is in the child's best interest is forever foreclosed. This position is not unique to adoption or termination proceedings. It is also expressed statutorily and in case law in juvenile dependency proceedings. The Juvenile Act, 42 Pa.C.S.A. § 6341 Adjudication, (a) requires that court must find from clear and convincing evidence that the child is dependent before it can proceed; (c) to determine the disposition of that child. In *Helsel v. Blair County Children and Youth Services*, 359 Pa.Super. 487, 519 A.2d 456 (1986), we held that a determination of dependency is a prerequisite to disposition on custody issues in a dependency proceeding. Best interest does not become a concern until dependency is established by clear and convincing evidence. *Id.* Similarly, best interest or the child's welfare does not become a concern until there is sufficient evidence which is clear and convincing that the legal standard for termination has been met. This concept is carved into the law involving state intervention into families because the legislature in-

---

1. This is true only as between parents. When a third party is an adversary to the parents, our courts have stated that the parent has a prima facie right to custody; the third party has a heavy burden to overcome this right and the evidentiary scale is tipped hard to the parent's side. When the parent and the state are adversaries, the state may intervene only in accordance with the statute and its burden is very heavy. *Ellerbe v. Hook*, 490 Pa. 363, 416 A.2d 512 (1980), *In Re Custody of Hernandez*, 249 Pa.Super. 274, 376 A.2d 648 (1977).

tended to prevent well meaning judges and social agencies from removing children from poor homes or marginal situations and placing them with the wealthy or in better environmental surroundings. *In the Interest of LaRue,* 244 Pa.Super. 218, 366 Pa.Super. 1271 (1976); *Stapleton v. Dauphin County Child Care Service,* 228 Pa.Super. 371, 324 A.2d 562 (1974); *Rinker Appeal,* 180 Pa.Super. 143, 117 A.2d 780 (1955). Consideration of best interest is postponed, if considered at all, until the state carries its burden of establishing by the high degree of proof of clear and convincing evidence that the child is dependent. Then it may, in fact must, consider what is in the best interest of the child.

Similarly, the involuntary termination proceedings, historically and pursuant to the most recent statute under review here, require the state to carry its very heavy burden of proving that the legal requirements of termination have been met. Termination of parental rights is the death sentence to a parent-child relationship. Section 2511, Grounds for involuntary termination, a(1), (2), (3), (4), (5) provides explicit legal tests and conditions which must be established before termination of parental rights *may* be decreed. Section (a), General rule, states: "The rights of a parent in regard to a child *may* be terminated after a petition filed on any of the following grounds." (Emphasis added.)

This does not mean that although the findings are legally conclusive, termination must be decreed. Subsection (b) Other considerations, provides: "The court in terminating the rights of a parent shall give *primary consideration to the needs and welfare of the child.* The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent." (Emphasis added.)

Subsection (b) is a clear legislative mandate to undertake further inquiry. This absolutely does not rule out an inquiry as to the best interest of the child. The legislative

intent is clear—once the evidence for termination has been established, the court may then consider disposition. In stating primary consideration is given to the needs and welfare of the child, the legislature did not create a new dispositional test or standard which required a search for the meaning of *"needs and welfare"*. It simply meant that in the fact finding or adjudicatory phase, the interests of the child and his parents are presumed to be identical, that is they should be considered together as a family entity, and the state must establish this presumption has been overcome by clear and convincing evidence of parental unfitness. Once the state has established the parent is unfit by proof of any of the five categories established by section 2511, it then may receive the benefit provided by subsection (b) and no longer give equal weight to the parent's rights but rather focus entirely on the child. The majority, in its analysis and relying on *Adoption of R.I.*, 468 Pa. 287, 361 A.2d 294 (1976), in its discussion on "need and welfare", struggles to come up with a new standard that is different from best interest.[2] The error is derived from focusing on the term "needs and welfare" and failing to consider the larger phrase, "shall give *primary consideration to the needs and welfare of the child.*" Viewed in this manner, the meaning is clear that the judge is free to consider *primarily* what is in the child's best interest (needs and welfare) as opposed to any consideration for the parent's rights or interest. In both *Smith v. Organization of Foster Families*, 431 U.S. 816, 97 S.Ct. 2094, 53 L.Ed.2d 14 (1977), and *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982), the United States Supreme Court determined the state may not terminate a parent's right to custody without showing parental unfitness and for the sole reason that to do so was in the children's best interest. *See also Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct.

---

**2.** The majority concedes that *"additional factors* as Judge Tamilia defines as consideration of the child's best interest" may result in the court's not terminating parental rights (Slip Op. at 8; emphasis added). I go further, however, and would hold that a termination finding cannot be made without considering best interest even though the parents have been found to be unfit.

1208, 31 L.Ed.2d 551 (1972). Indeed this is basically the argument proposed by the parents, that the court permitted best interest considerations "to creep into and subvert the adjudicatory phase." However, no argument is made or can be made that best interest is not a consideration in the dispositional phase, detailed in section 2511(b). In this respect, *Santosky* is very illuminating in clearly stating the standard to be followed as to both phases of the proceeding.

At the factfinding, the State cannot presume that a child and his parents are adversaries. After the State has established parental unfitness at that initial proceeding, the court may assume at the *dispositional* stage that the interests of the child and the natural parents do diverge. *See* [New York] Fam Ct Act § 631 (judge shall make his order "solely on the basis of the best interests of the child," and thus has no obligation to consider the natural parents' rights in selecting dispositional alternatives). But until the State proves parental unfitness, the child and his parents share a vital interest in preventing erroneous termination of their natural relationship.

*Santosky* 455 U.S. at 760, 102 S.Ct. at 1398, 71 L.Ed.2d at 611 (footnote omitted).

As the Supreme Court pointed out in *Santosky*, section 631 of the New York Act, the equivalent of Pennsylvania section 2511(b) (primary concern for needs and welfare of child), permitted a shift in focus solely to the child's best interest and away from the lock-step interest of parent and child, once the parent was found to be unfit. The Pennsylvania statute means nothing more. A survey of statutes and case law of several of the more populus states compels the same conclusions. In Texas, Vernon's Codes Annotated, Family Code § 15.02, Involuntary Termination of Parental Rights, provides,

A petition requesting termination of the parent-child relationship with respect to a parent who is not the petitioner may be granted if the court finds that:

1) the parent has:

· · · · ·

which is followed by A through K categories of parental fault or omission; and

2) *termination is in the best interest of the child. Id.* (Emphasis added.) Cases in the commentaries provide that best interest is always relevant but that termination may not be based upon best interest alone. *Clay v. Texas Dept. of Human Resources,* (App. 10 Dist.1988) 748 S.W.2d 598, holds that involuntary termination of the parent-child relationship may not be based solely on determination of best interest of child: in addition to best interest of child, one or more acts or omissions under this section must be proved. This is virtually identical to the Pennsylvania position.

The Illinois statute is not so precise as is Pennsylvania, Texas, New York and California, but its effect is the same. The Illinois Code, S.H.A. ch. 37, paragraph 803–30, section 3–30, Adoption–Appointment of guardian with power to consent, provides a ward of the court under the juvenile act may be the subject of a petition for adoption which may allege that it is in the best interest of the child to be adopted, whereupon the court may appoint a guardian of the child who is authorized to consent to the adoption if the court finds, upon clear and convincing evidence that the parent(s) are *unfit* according to the definition of "unfit person" in the Adoption Act.

The Illinois Adoption Statute at ch. 40 Domestic Relations, § 1501, Definitions, includes the same requirements for reasons to terminate (and many more) as are provided for in the Pennsylvania Statute. The Illinois case law supports the identical basis for a decree of termination.

In *Perkins v. Breitbarth,* 54 Ill.Dec. 458, 99 Ill.App.3d 135, 424 N.E.2d 1361 (1981), it was held that in proceeding to terminate parental rights, a finding of parental unfitness, supported firmly by evidence, is prerequisite to addressing the question of child's best interest. In *In Interest of Grotti,* 42 Ill.Dec. 150, 86 Ill.App.3d 522, 408 N.E.2d 728 (1980), the appellate court held the trial court properly

considered best interest in conjunction with making general findings of unfitness of parents.

New York, under its Family Court Act, makes clear what the Pennsylvania Act also requires, but does so in a far more definitive manner. Title 29A, McKinney's Case Laws of New York, Family Court Act, Art. 6, Part I Termination of Parental Rights, § 622, provides for a "fact-finding hearing" to determine that requirements of section 614 are met (that parent is unable or incapable, after diligent effort by the agency, to provide minimum care for the child). Following the fact finding hearing, pursuant to section 623, defining "dispositional hearing", a hearing is held to determine what order of disposition should be made in accordance with the best interest of the child. Section 631, Disposition on adjudication of permanent neglect, allows the court to a) dismiss the petition, b) suspend judgment for up to one year, c) commit the child to guardianship and custody of petitioner under such condition it deems proper,—*solely on the basis of the best interest of the child without presumption that such interest will be promoted by any particular disposition.*

The majority focuses entirely on the adjudication stage and rightfully determines that best interest plays no part in this determination. However, a termination proceeding is not completed in the first phase and must proceed to an equally important phase delineated by section 2511(b) where, after determining that termination *may* be decreed pursuant to section 2511(a)(1–5), best interest primarily from the point of view of the child's needs and welfare must be considered, except where certain environmental factors exist *causing* the dependency problem, which are beyond parental control. In *Adoption of R.I., supra,* the Supreme Court, in two places affirms this position. In footnote 12 the court states:

> The best interest of the child cannot be considered in a proceeding to terminate parental rights until after a finding that the statutory requirements for termination have been met. Thus *we consider R.I.'s best interest* to

support the orphans' court decree only because the statutory requirements of Section 311(2) have been met in this case.

*Id.* 468 Pa. at 299 n. 12, 361 A.2d at 300 n. 12 (emphasis added; citations omitted).

In the main text of the Opinion, the Court concludes:

Because there is compelling evidence to support the trial court's finding of continued and repeated neglect under section 311(2) and because R.I.'s welfare would be promoted by terminating appellant's parental rights, we affirm the orphans' court decree.

*Id.,* 468 Pa. at 300, 361 A.2d at 300.

If there is no foreseeable place for a child to go but an institution, it could be better for the child to maintain some contact with the natural parent, however tenuous or inadequate, if termination was not decreed. Likewise, with some children a form of termination could be decreed which would continue involvement and visitation by the parents. *In Re B.E.,* 474 Pa. 139, 377 A.2d 153 (1977) (Petition for involuntary termination was intended by the legislature solely as an aid to adoption. It eliminates the need for adoptive parents to be involved, but an agency must have a contemplated adoption in order for termination to be granted). As the Supreme Court held in *Karis v. Karis,* 518 Pa. 601, 544 A.2d 1328 (1988), the changing life of a child requires that we permit review of custody decisions based on a child's best interest, rather than being bound by the doctrine of substantial change of circumstance. This is simply a recognition that hard and fast rules dealing with the complexities of child development and family life prove to be detrimental and unworkable in such a complex social and legal area. The state with the most complete and comprehensive legislation as to this issue and the degree to which the best interest of the child must ultimately be considered in a termination proceeding is California. In California, the provisions for termination comparable to section 2511 are found in West's Annotated California Code, Chapter 4, Freedom from Parental Custody and Control. Persons entitled to be declared free from parental custody

and control under section 232 are those under sections a), who are under eighteen who meet any one or more of eight descriptions, which basically are identical or similar to those categories under section 2511(a)(1)–(5). Section 232(b), provides:

(b) **Wishes and best interest of child; testimony of minor in chambers.** At all termination proceedings, the court shall consider the wishes of the child and shall act in the best interest of the child (it is then provided for the procedure for taking testimony).

(c) **Clear and convincing evidence.** A finding pursuant to this section shall be supported by clear and convincing evidence.

The Welfare and Institution Code, amendments effective in January 1989, in effect, separated children adjudicated dependent from the previously cited sections, Freedom from Custody and Control, § 232, and provided in section 366.26, Hearings terminating parental rights or establishing guardianship of minors adjudged dependent children of court on or after January 1, 1989; procedures and orders, that termination hearings would be heard in the Juvenile Court. I insert a portion of the California Statute, but by no means the majority of the statute as it is the most recent, exhaustive and far reaching in its provisions. The termination provision provides as follows:

(b) At the hearing, which shall be held in juvenile court for all minors who are dependents of the juvenile court, the court shall review the report as specified in Section 361.5, * * * 366.21, or 366.22, shall indicate that the court has read and considered it, shall receive other evidence that the parties present, and then shall do one of the following:

(1) Permanently sever the parent or parents' rights and order that the child be placed for adoption.

(2) Without permanently terminating parental rights, identify adoption as the permanent placement goal and order that efforts be made to locate an appropriate adoptive family for the minor for a period not to exceed 60 days.

(3) Without permanently terminating parental rights, appoint a legal guardian for the minor and issue letters of guardianship * * *.

(4) Order that the minor be placed in long-term foster care, subject to the regular review of the juvenile court.

In choosing among the above alternatives the court shall proceed pursuant to subdivision (c).

(c) At the hearing the court shall proceed pursuant to one of the following procedures:

(1) It shall terminate parental rights if it determines by clear and convincing evidence that it is likely that the minor will be adopted. The findings pursuant to subdivision (b) of Section 361.5 that reunification services shall not be offered, or the findings pursuant to subdivision (e) of Section 366.21 'that the whereabouts of a parent have been unknown for six months or that the parent has failed to visit or contact the child for six months or that the parent has been convicted of a felony indicating parental unfitness, or pursuant to paragraph (2) of subdivision (g) of Section 366.21 or subdivision (a) of Section 366.22 that a minor cannot or should not be returned to his or her parent or guardian, are a sufficient basis for termination of parental rights unless the court finds that termination would be detrimental to the minor due to one of the following circumstances:

(A) The parents or guardians have maintained regular visitation and contact with the minor and the minor would benefit from continuing the relationship.

(B) A minor 10 years of age or older objects to termination of parental rights.

(C) The child is placed in a residential treatment facility, adoption is unlikely or undesirable, and continuation of parental rights will not prevent finding the child a permanent family placement if the parents cannot resume custody when residential care is no longer needed.

(D) The minor is living with a relative or foster parent who is unable or unwilling to adopt the minor because of exceptional circumstances, which do not include an unwillingness to accept legal responsibility for the minor, but

who is willing and capable of providing the minor with a stable and permanent environment and the removal of the minor from the physical custody of his or her relative or foster parent would be detrimental to the emotional well-being of the minor.

I would, therefore, hold that if the adjudicatory phase established parental unfitness by clear and convincing evidence, the court could proceed to hear evidence with primary consideration for the needs of the child which would permit the judge to enter a decree *solely* in the best interest of the child. This is precisely the approach detailed by our Supreme Court in *In re Adoption of J.J.*, 511 Pa. 590, 515 A.2d 883 (1986), in discussing lack of capacity.

> The statute makes it clear that grounds for termination consist of lack of capacity and not just affirmative misconduct. *Judicial inquiry is to be centered on the best interest of the child, rather than the fault of the parent.*

*Id.*, 511 Pa. at 607, 515 A.2d at 892 (emphasis added, footnote omitted). Both *In re Adoption of A.N.D.*, 360 Pa.Super. 157, 520 A.2d 31 (1987), and *In re Adoption of Hamilton*, 379 Pa.Super. 274, 549 A.2d 1291 (1988), correctly follow *In re Adoption of J.J.*, *supra*, and should not be rejected for citing best interest considerations, as held by the majority. In attempting to distinguish best interest, the majority is simply abandoning it, when all that is required is to make certain, as in juvenile proceedings, it is introduced in the proper procedural sequence. The majority erroneously limits best interest to a balancing test in child custody proceedings with no application to termination proceedings. There is no need to limit best interest only to child custody matters between two parents when it is an underlying principle in all child related litigation (change of name, legitimacy, adoption, juvenile delinquency, abortion, emancipation, under age marriage). The majority fails to clarify this issue and will permit a spurious concept to creep into the law which is possibly not intended. Despite finding that the state has carried its burden that termination may be decreed, a final Order of termination of parental rights is

not a foregone conclusion until a review pursuant to section 2511(b) determines it is in the best interest of the child. While here it appears suitable adoptive parents are available for the Coast children, it is not difficult to visualize instances where termination is not in the best interest of the child. Adoption today is becoming a very flexible tool for permanency planning for dependent children. While section 2511 frees many children for adoption, parental rights in some cases are terminated when adoption is not a viable option. One inquiry under section 2511(b) which may be made is whether the best interest or needs and welfare of a child is being met by termination or a determination of the options which are available. Here, a best interest review has established the parents have conclusively been determined to have failed in their parental responsibilities with no reasonable likelihood that they can resume proper care of the children. Indeed, even parental visitation is deemed unsuitable because of the harm to the children. The children have expressed their desire not to return to their natural parents and the court immediately has available for them adoptive parents who can and will meet their needs. A finding that it is in the children's best interest, pursuant to section 2511(b), is supported by the record, and I would so find.

OLSZEWSKI, J., joins TAMILIA, J.