J-S09044-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: N.S., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: R.M., NATURAL MOTHER | : | No. 1594 WDA 2018 |

Appeal from the Order Entered October 9, 2018
in the Court of Common Pleas of Allegheny County
Orphans' Court at No(s): CP-02-AP-0000109-2018

BEFORE: PANELLA, P.J., LAZARUS, J. and STRASSBURGER, J.*

MEMORANDUM BY STRASSBURGER, J.: **FILED APRIL 26, 2019**

R.M. (Mother) appeals from the order entered October 9, 2018,[1] in the Court of Common Pleas of Allegheny County, which terminated involuntarily her parental rights to her minor son, N.S. (Child), born in January 2017.[2] We affirm.

The orphans' court summarized the factual and procedural history of this matter as follows.

---

* Retired Senior Judge assigned to the Superior Court.

[1] The order is dated September 14, 2018, but it was filed on October 9, 2018.

[2] The order also terminated involuntarily the parental rights of Child's father, N.S. (Father). The next day, the orphans' court entered orders withdrawing the involuntary termination petition as to Father, confirming Father's consent to Child's adoption, and terminating his parental rights on that basis. Father did not appeal the termination of his parental rights, nor did he participate in this appeal.

On March 24, 2017, [Child] was admitted to UPMC Children's Hospital with a bucket handle fracture of his right tibia. The injury was diagnostic of physical child abuse and it was reported that medical staff determined that it could not have been caused by routine care of an infant. [The Allegheny County Office of Children, Youth and Families (CYF)] and law enforcement were contacted after the parents failed to provide a reasonable explanation for [Child]'s injury. Based upon the parent[s'] responses or lack thereof, []CYF sought and was granted an emergency custody authorization for [Child] on March 24, 2017. [Child] was discharged from the hospital on March 26, 2017, and placed in the care of his maternal aunt and maternal grandmother. []CYF conducted further investigation into the family and discovered that the parents did not have stable housing and that [Father] was a recovering heroin addict.

A shelter hearing was held on March 27, 2017[,] and the court ordered [Child] remain in placement. []CYF filed a dependency petition that day. An adjudicatory hearing was held on May 31, 2017 and [Child] was adjudicated dependent pursuant to 42 Pa.C.S. § 6302(1). Mother was ordered to undergo a forensic evaluation, a drug and alcohol evaluation and comply with any recommendations, to attend parenting classes, to work with in-home services, and to engage in mental health services. Throughout the next month and a half, Mother visited [Child] regularly.

On July 18, 2017, Mother was charged with endangering the welfare of children as a result of the injury inflicted upon [Child]. As a condition of Mother's bail, she was ordered to have no contact with [Child] and all visitation ceased.

A permanency hearing was held on September 7, 2017[,] and the court ordered that [Child] remain in placement. The court ordered Mother to engage in mental health treatment and trauma therapy at Pittsburgh Action Against Rape, hereinafter PAAR. Mother reported that she had received services for her intellectual disabilities as a child and as a result, []CYF recommended that she be court ordered to undergo an evaluation at Achieva. The court agreed and ordered Mother to undergo an evaluation at Achieva.

A permanency hearing was held on October 5, 2017[,] and Mother was ordered to engage in mental health treatment,

PAAR, and Achieva. [Child] was placed in the foster home of S.C. and M.C.[] A permanency hearing was held on January 4, 2018[,] and the court ordered Mother to follow through with West Penn Hospital for mental health treatment, medication management, and to follow through with PAAR and Achieva. Mother was engaged in trauma therapy at PAAR at the time of the hearing. A permanency hearing was held on April 19, 2018[,] and the court ordered Mother to continue treatment at PAAR, to contact Achieva, and to get into mental health treatment.

The no-contact order imposed in the criminal case was lifted in February of 2018. The court had concerns about initiating visitation immediately as Mother had not seen [Child] in over six months. The hearing officer presiding over the case ordered Mother to undergo an individual psychological evaluation and an interactional psychological evaluation in hopes that it would provide the court with guidance on how to [structure appropriately] the visitation.[3]

Clinical psychologist Neil Rosenblum[, Ph.D.] conducted an individual psychological evaluation of Mother … and an interactional psychological evaluation of [Child] and [] [M]other. During the individual evaluation, [Dr. Rosenblum] assessed Mother's IQ to be 68, which was at the upper end of the mild range of intellectual disability. During her evaluation, Mother reported that Father had caused the injury to [Child] and that she did not take [Child] to the hospital for several days despite knowing [Child] was seriously injured….

[]CYF filed the petition to [terminate involuntarily] Mother's parental rights on May 15, 2018. On June 11, 2018, Mother pled guilty to one count of endangering the welfare of children and was sentenced to two years of probation.

---

[3] Mother did not visit with Child until an interactional evaluation on April 13, 2018, and her regular visits did not resume until May 2018. N.T., 9/14/2018, at 17; CYF Exhibit 3 (Dr. Rosenblum's evaluation).

J-S09044-19

Orphans' Court Opinion, 12/7/2018, at 2-5 (footnotes omitted and some capitalization altered).

The orphans' court conducted a termination hearing on September 14, 2018, after which it took the matter under advisement.[4] On October 9, 2018, the court entered the order terminating Mother's parental rights to Child involuntarily. Mother timely filed a notice of appeal and concise statement of errors complained of on appeal on November 7, 2018. She filed an amended notice of appeal and concise statement on November 13, 2018, to correct a typographical error.

Mother now raises the following claim on appeal. "Did the [orphans'] court abuse its discretion and/or err as a matter of law in concluding that termination of [] Mother's parental rights would serve the needs and welfare of the child pursuant 23 Pa.C.S. §[]2511(b)?" Mother's Brief at 6.

We review Mother's claim mindful of our well-settled standard of review.

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law

_____

[4] Child was about 1½ years old as of the date of the hearing, and Franklin McWilson, Esquire, served as Child's legal counsel. At the conclusion of the hearing, Attorney McWilson argued in support of terminating Mother's parental rights. N.T., 9/14/2018, at 96-98. He also filed a brief on appeal supporting termination.

- 4 -

or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Section 2511 of the Adoption Act governs involuntary termination of parental rights. *See* 23 Pa.C.S. § 2511. It requires a bifurcated analysis.

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in [subs]ection 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to [subs]ection 2511(b): determination of the needs and welfare of the child….

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

Here, the orphans' court terminated Mother's parental rights pursuant to subsections 2511(a)(2), (5), (8), and (b). In her brief on appeal, Mother concedes that CYF presented clear and convincing evidence that her parental rights should be terminated pursuant to subsection 2511(a)(2). *See* Mother's Brief at 13 ("CYF, the petitioner, did clearly and convincingly establish threshold grounds for termination pursuant to 23 Pa.C.S. §[]2511(a)(2)."). We need only agree with the court as to any one subsection of 2511(a), as well as subsection 2511(b), to affirm. *In re*

**B.L.W.**, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Therefore, we need only consider whether the orphans' court abused its discretion by terminating Mother's rights pursuant to subsection 2511(b), which provides as follows.

> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(b).

The requisite analysis is as follows.

S[ubs]ection 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. As this Court has explained, [subs]ection 2511(b) does not explicitly require a bonding analysis and the term 'bond' is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether

- 6 -

> any existing parent-child bond can be severed without detrimental effects on the child.

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa. Super. 2015) (quoting *In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011)) (quotation marks and citations omitted).

In conducting its subsection 2511(b) analysis, the orphans' court found that Mother's intellectual disability and extensive history of trauma interfere with her parental capacity, and render her unable to meet Child's basic needs. Orphans' Court Opinion, 12/7/2018, at 6-7. Further, Mother is unable to meet Child's special medical needs. *Id.* The court found Mother "lacked insight" into and knows little about Child's neurological and other medical issues. *Id.* Concerning Child's relationship with Mother, the court found that "very little to no bond" exists between them. *Id.*

The orphans' court further reasoned that Child shares a bond with his pre-adoptive foster parents, Child seeks them out for comfort and support, and Child has formed a "very strong, primary attachment" to them. *Id.* at 7. It determined that Child's foster parents are "exceptionally proactive and attentive" to his basic and special medical needs. *Id.* Accordingly, the court concluded that terminating Mother's parental rights would best serve Child's needs and welfare. *Id.*

Mother challenges the findings of the orphans' court, contending that the court committed an abuse of discretion and error of law by conducting a "fault-based and comparative" analysis of subsection 2511(b). Mother's Brief at 18. Specifically, Mother contends that the court focused improperly

on her failings as a parent and on the benefits that Child would receive by remaining with his foster parents when assessing his needs and welfare. *Id.*

The record supports the orphans' court's findings and we discern no abuse of discretion or error of law. During the termination hearing, CYF presented the expert testimony of Dr. Rosenblum. Dr. Rosenblum testified that he conducted evaluations of Mother, Child, and Child's foster parents. N.T., 9/14/2018, at 66. In Dr. Rosenblum's opinion, Mother's intellectual disabilities and mental health issues interfere with her ability to parent Child. *Id.* at 69-70. As Dr. Rosenblum reported, Mother "has trouble making appropriate decisions" and her decisions "place[ Child] at risk." *Id.* at 72. Significantly, this was established when Mother failed to obtain medical care for Child immediately after she became aware of Child's injuries "because she was influenced by [Father] not to do so." *Id.* Dr. Rosenblum opined that Mother "has never been able to maintain any degree of independence" and lacks stability necessary to care for Child. *Id.* at 71-72, 76. When Dr. Rosenblum evaluated Mother, she "was not even close to being able to stabilize her own personal functioning," "let alone provide for the stability of [Child.]" *Id.* at 76. She failed to avail herself of Achieva's comprehensive services, including independent living, parenting, and decision-making skills; mental health intervention and counseling; vocational training; and housing. *Id.* at 73-74, 87. Moreover, Dr. Rosenblum opined that Mother does not have a good support system, and she has never been able to maintain her own housing. *Id.* at 70-71, 75. Mother has endured a series of troubled

and traumatic relationships where she relies on her boyfriends or their families for housing and support. *Id.*

Dr. Rosenblum explained that Child also exhibits special needs, including developmental delays and a progressive neurological disorder for which he is receiving ongoing evaluation and treatment.[5] *Id.* at 78-79. Dr. Rosenblum opined that Child is in need of stable and reliable caregivers who can provide him with appropriate medical treatment, including initiating appropriate medical care, coordinating medical services, and following through with appointments and medical recommendations; he believes that Mother would be "very compromised and challenged" to do so. *Id.* at 79-80.

Addressing Child's emotional well-being, Dr. Rosenblum testified that Child "didn't seem to necessarily be that familiar" with Mother during their interactional evaluation.[6] *Id.* at 77. Indeed, at the time of the evaluation,

---

[5] Child's café au lait spots suggest a diagnosis of the progressive neurological disorder neurofibromatosis (NF1), which results in lifelong concern for tumors along the nerve pathways of his body, eye lesions, and developmental delays. *Id.* at 55-57. NF1 requires close neurological observation and regular ophthalmic screenings. *Id.* at 25-27, 56, 62. Child also suffers from asthma, multiple allergies, and has had surgery for chronic ear infections. *Id.*

[6] Dr. Rosenblum acknowledged that Child's lack of familiarity with Mother was not surprising, given that he had not seen her recently. N.T., 9/14/2018, at 77. As explained *supra*, the no-contact order in Mother's criminal case lasted from July 2017 until February 2018. *Id.* at 17. Mother's evaluation with Child occurred on April 13, 2018, and regular visits

*(Footnote Continued Next Page)*

he believed that it was important for Mother to "start building a relationship" with Child.[7]  *Id.* at 82.  Mother had difficulty providing Child with age-appropriate cognitive or developmental activities.  *Id.* at 77-78.

In contrast, Dr. Rosenblum testified that Child displays a very strong attachment to his pre-adoptive foster parents and appears to be thriving in their care.  *Id.* at 80-81.  Child's foster parents are both social workers who have significant experience working with special needs children, and according to Dr. Rosenblum, they are "extremely conscientious[ and] very well-trained in being able to interact with young children."  *Id.* at 80.  They are doing an "outstanding job" and are attentive to all of his needs, and specifically, his medical needs.[8]  *Id.* at 44, 55, 80-81.  Dr. Rosenblum opined that adoption by the foster parents would best serve Child's needs and welfare, explaining that it would allow Child to "remain in a home that [is] consistently supportive, stable and responsive to his developmental needs, his at-risk medical needs."  *Id.* at 81.

*(Footnote Continued)* ————————

did not resume until May 2018.  *Id.*; CYF Exhibit 3 (Dr. Rosenblum's evaluation).

[7] Dr. Rosenblum reports that foster parents want Mother to have contact and visitation with Child and have "gone out of their way" to maintain contact with Mother's extended family, including inviting them to Child's first birthday party and Christmas.  N.T., 9/14/2018, at 82-84.

[8] Child requires monthly doctor's appointments, and sometimes he has two or three appointments per month.  N.T., 9/14/2018, at 55.

CYF presented also the testimony of caseworker Leah Massey, who confirmed that foster parents are a non-kin, adoptive resource, and that Child is "very attached and bonded" with his foster parents. *Id.* at 44. Foster parents give Child a lot of affection, and Child likes to be held by, responds well to, and goes to his foster parents for support. *Id.* at 43. Ms. Massey has no concerns about Child's care with foster parents. *Id.* at 44.

Accordingly, the record supports the findings of the orphans' court with respect to subsection 2511(b). The effect of Mother's inability to provide adequate parental care for Child is that Child's needs and welfare cannot be met in Mother's care. Mother's parenting deficits are especially problematic given Child's ongoing medical needs and her failing to seek immediate medical care for Child when he was the victim of child abuse at two months of age. Moreover, Child has had little recent interaction with Mother due to the no-contact order in her criminal case, and it is clear that he does not share a necessary and beneficial bond with her. Child is thriving in the home of his foster parents. They are addressing successfully all of his needs, he is bonded to them, and they can provide him permanency, safety, and security through adoption.

In reaching this conclusion, we reject Mother's claim that the orphans' court placed an undue emphasis on her failings as a parent. *In re G.M.S.*, 193 A.3d 395, 403 (Pa. Super. 2018) (rejecting mother's "assertion that the orphans' court placed an undue emphasis on her failings as a parent" in its subsection 2511(b) analysis). Mother is correct that subsection 2511(b)

focuses on Child's needs and welfare, rather than her parental incapacity. *In re G.M.S.*, 193 A.3d at 403. However, it is clear in this case that Mother's parental incapacity, and the likelihood that she will never remedy that incapacity, is an important consideration when determining what is best for Child's developmental, physical, and emotional needs and welfare under subsection 2511(b). *Id.*, *citing* **C.D.R.**, 111 A.3d at 1220 ("Clearly, it would not be in Child's best interest for his life to remain on hold indefinitely in hopes that Mother will one day be able to act as his parent.") (citation omitted). In essence, the orphans' court is permitted to consider the effect of Mother's incapacity on Child. This is particularly the case because Child's safety is at issue in Mother's care. ***See In re Adoption of J.N.M.***, 177 A.3d 937, 946 (Pa. Super. 2018) (holding a court may prioritize a child's safety and security needs).

Further, the law permits the orphans' court to consider the totality of the circumstances when examining a child's needs and welfare. "[V]iewing the totality of the circumstances is entirely proper and is not the same thing as applying a balancing analysis." ***In Interest of Coast***, 561 A.2d 762, 771 (Pa. Super. 1989) (*en banc*) (citation and internal quotation marks omitted). At the point the orphans' court looks at a child's needs pursuant to subsection 2511(b), it has already determined that the parent is unfit under subsection 2511(a). *Id.* at 770. Therefore, as part of the needs and welfare analysis, the law permits the orphans' court to consider the relationship a

child has with his or her foster parents and to examine whether a child's needs are met by the foster parents. **C.D.R.**, 111 A.3d at 1219.

Based on the foregoing, we conclude that the orphans' court did not abuse its discretion or commit an error of law by terminating involuntarily Mother's parental rights to Child. Therefore, we affirm the court's October 9, 2018 order.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/26/2019