J-S37002-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: S.F., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: J.J., FATHER | : | |
| | : | No. 1497 EDA 2022 |

Appeal from the Order Entered May 11, 2022
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-DP-0000200-2021

| | | |
|---|---|---|
| IN THE INTEREST OF: J.J., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: J.J., FATHER | : | |
| | : | No. 1498 EDA 2022 |

Appeal from the Order Entered May 11, 2022
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-DP-0000571-2020

BEFORE:  BOWES, J., LAZARUS, J., and OLSON, J.

MEMORANDUM BY BOWES, J.:          **FILED DECEMBER 9, 2022**

      J.J. ("Father") files these consolidated appeals from the May 11, 2022

dispositional orders[1] that suspended his visitation with his daughters, J.J.,

---

[1] It is well established that dispositional orders are final and appealable. **See
Interest of J.M.**, 219 A.3d 645, 652 (Pa.Super. 2019) ("[T]he dispositional
order following a dependency adjudication . . . is a final appealable order.").

born in March 2018, and S.F., born in February 2021, following the tragic death of a third child, Ju.J. We affirm.

On July 14, 2020, the Philadelphia Department of Human Services ("DHS") obtained protective custody of J.J., N.F.,[2] and Ju.J. after receiving a report alleging that their mother, M.F. ("Mother") punched then four-month-old Ju.J. in the head and attempted to set fire to Father's clothes. The report further alleged that Mother had untreated mental health problems and substance abuse issues and that there was a history of domestic violence between Mother and Father. At the time, the family was known to DHS and had been receiving services. On August 18, 2020, the court adjudicated all three children dependent and committed them to DHS's custody.

Thereafter, DHS obtained protective custody of S.F. on February 26, 2021, after both Mother and S.F. tested positive for cocaine at S.F.'s birth. Following a shelter care hearing, the court placed S.F. in kinship care with her paternal grandmother ("Paternal Grandmother"). At the ensuing hearing, the juvenile court held that S.F. was not a dependent child and transferred legal and physical custody of the child to Father.

On May 6, 2021, the court reunified N.F., J.J., and Ju.J. with Father. The court discharged the commitment and returned legal and physical custody

_____

[2] Father is not N.F.'s biological parent, and N.F. is not a subject of this appeal. As discussed further in the body of this writing, DHS's investigation into Ju.J.'s death produced an indicated report identifying Father as a perpetrator of sexual and physical abuse against N.F. **See** N.T., 5/11/22, 28, 29. On December 17, 2021, DHS placed N.F. in foster care through Northern Children's Services, where she remains.

to Father with DHS supervision.  The court further provided for Mother, whom it believed then resided separately, to have liberal supervised visits with the children and to continue her drug and alcohol treatment.  Permanency Review Order, 5/6/21; N.T., 5/6/21, at 9-10, 23-25.  Then, on October 26, 2021, the court terminated court supervision for all three children due to their reunification with Father.  However, the court specifically directed Father "to comply with not allowing Mother unsupervised visits."  Order for Termination of Court Supervision, 10/26/21; N.T., 10/26/21, at 9, 11.

Approximately two months after the termination of court supervision, then-fifteen-month-old Ju.J. died at the family's home.  N.T., 5/11/22, at 12. Father transported the child to Christopher's Hospital for Children, but they were unable to resuscitate her.  The general protective service report filed in response to the infant's death alleged that, upon arriving at the Hospital, several bruises were observed on Ju.J.'s head and legs and blood was in Ju.J.'s mouth.

DHS supervisor Amy Crescenzo[3] recounted the pertinent facts as follows:

> The allegation was that in the morning of December 16th, N.F. went to school crying that her baby sister[, Ju.J.,] was killed by [Mother].
>
> At the time of the report [N.F.] . . . walk[ed] to school alone, was crying, upset, and the Police were notified.  [N.F.] was

---

[3] The notes of testimony of May 11, 2022 misnamed Ms. Crescenzo as Amy Cristenzo.

transported to [the Special Victims Unit] and had a forensic interview.

At that time, during the forensic interview, [N.F.] gave a horrible description of abuse that she witnessed [at] the hands of [Mother,] where [Ju.J.] was physically abused by her mother. She described hot sauce being poured down [Ju.J.]'s throat. She drew descriptions, pictures of the abuse and was crying continuously.

*Id*. at 13-14; *see also* N.T., 5/11/22, Exhibit DHS 1 (cleaned up).[4]

Ms. Crescenzo additionally confirmed that "it was learned that [Ju.J.] was brought to the hospital by Mother and Father and [Ju.J.] was deceased at the time at the hospital." N.T., 5/11/22, at 13-14. Thereafter, over the

---

[4] As detailed, in part, in the forensic interview summary:

[N.F.] said one day, her baby sister [Ju.J.] (1yo) "did her business" in the diaper so [Mother] took her to wash her. Then, [Ju.J.] "did her business" again on the sister's bed and [Mother] wiped her. When [Mother] left and returned, [Ju.J.] was on the floor and [N.F.] heard [Mother] say, "get up, get up[."] [Mother] took [Ju.J.] downstairs and stood her against the fridge and table, but then [Ju.J.] fell to the floor. [Mother] said, "get up, get up" and then [Ju.J.] bit [Mother]'s finger. [Mother] got a bottle of hot sauce and rag and while [Ju.J.] was laying on the floor, [Mother] held the towel to [Ju.J.] and made her drink the bottle of hot sauce until there was only a little left, saying "drink, drink" while [Ju.J.] was crying. [Mother] then had [Ju.J.] face the floor, holding her hands behind her back and [N.F.] demonstrated that [Mother] had her knee on [Ju.J.] and was "squishing her" and "bouncing on her" while holding her mouth saying "shush[."] [Ju.J.] was crying, then [Mother] took her upstairs to her room.

. . . .

[N.F.] said [Mother] and [Father] are the ones that take care of [Ju.J.] [N.F.] described [Mother] as "being mean" towards [Ju.J.], but denied that anyone else is mean towards her.

N.T., 5/11/22, Exhibit DHS 1 at 5-6.

ensuing three-day period, Mother and Father absconded with S.F. and J.J. in an attempt to evade DHS.

As it relates to Father's argument on appeal, we summarize the relevant events during the period of avoidance. Upon bringing Ju.J. to the hospital, Father initially indicated that S.F. and J.J. were in the car. When questioned regarding this, he then reported that S.F. and J.J. were with their paternal aunt ("Paternal Aunt"). N.T., 5/11/22, at 15-16, 18. However, when DHS went to Paternal Aunt's home on two occasions, it was met with "resistance" and was unsuccessful in locating S.F. and J.J. at that location. *Id*. at 17, 31-34. Notably, while waiting for police assistance, a neighbor reported observing Paternal Aunt leaving the home with two children. *Id*. at 16, 34. Later, after Father failed to bring S.F. and J.J. for an interview on December 18, 2021, as agreed, the DHS investigator, Sharina Johnson, went to the family's residence escorted by the police and observed Mother and Father packing the car. In approaching the family, Ms. Johnson overheard Mother state that they would not be living there any longer. *Id*. at 17, 34-35. Thereafter, the police assisted DHS in removing the children from parents' custody.

Thus, after several days of attempting to locate S.F. and J.J., as well as speak with Mother and Father, DHS finally found the children and obtained a shelter care order. *Id*. at 35. S.F. and J.J. were, again, placed in kinship care with Paternal Grandmother. The shelter care order did not provide visitation for Mother and Father and included stay-away provisions against Mother, Father, and Paternal Aunt. In addition to the shelter care order, the court

issued a separate protective order that explicitly prohibited Mother, Father, and Paternal Aunt from engaging in any manner with S.F., J.J., and Paternal Grandmother.

On December 31, 2021, DHS filed dependency petitions with respect to S.F. and J.J. The trial court conducted an adjudicatory hearing on May 11, 2022. Both Mother and Father were present and represented by separate counsel. DHS presented the testimony Ms. Crescenzo, Ms. Johnson, and Cassandra Green, the Community Umbrella Agency ("CUA") case manager, who provided up-to-date testimony relating to S.F.'s and J.J.'s safety in Paternal Grandmother's kinship care. Neither Mother nor Father presented any evidence.

By separate orders entered on May 11, 2022, the trial court adjudicated one-year-old S.F. and four-year-old J.J. dependent pursuant to 42 Pa.C.S. § 6302(1)[5] and continued placement with Paternal Grandmother. The court established return to parent or guardian as S.F.'s and J.J.'s permanency goals. The Court suspended all visitation with Mother and Father due to the pending criminal investigation. Thereafter, Father timely filed notices of appeal, along with concise statements of errors complained of on appeal pursuant to

---

[5] Pursuant to 42 Pa.C.S. § 6302, "dependent child" is defined as "[a] child who is: (1) without proper care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals." 42 Pa.C.S. § 6302(1).

Pa.R.A.P. 1925(a)(2)(i) and (b).[6]  This Court consolidated the appeals *sua*

*sponte*.

Father raises the following issue for our review: "Whether the [t]rial

[c]ourt abused its discretion and committed legal error in suspending

[Father]'s visits with his children, where [DHS] did not prove by clear and

convincing evidence that visits between the children and Father would pose a

grave threat[?]"  Father's brief at 3.

We observe our standard of review for dependency cases is as follows:

> [T]he standard of review in dependency cases requires an
> appellate court to accept the findings of fact and credibility
> determinations of the trial court if they are supported by the
> record. . . but does not require the appellate court to accept the
> lower court's inferences or conclusions of law.  Accordingly, we
> review for an abuse of discretion.

*In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010) (citations omitted); *see also In*

*the Interest of L.Z.*, 111 A.3d 1164, 1174 (Pa. 2015).  "The trial court is

free to believe all, part, or none of the evidence presented and is likewise free

to make all credibility determinations and resolve conflicts in the evidence."

*In re M.G.*, 855 A.2d 68, 73-74 (Pa.Super. 2004) (citation omitted).

Turning to Father's issue on appeal concerning the trial court's

suspension of his visitation, we note that in dependency cases, where

reunification remains the goal, parental visitation may not be denied or

---

[6] Mother did not file appeals from these orders and did not participate in the
instant appeals.

reduced unless visitation poses a grave threat to the child. ***See In re C.J.***, 729 A.2d 89, 95 (Pa.Super. 1999).

In ***In re C.B.***, 861 A.2d 287 (Pa. Super. 2004), we explained:

The "grave threat" standard is met when the evidence clearly shows that the parent is unfit to associate with his or her children; the parent can then be denied the right to see them. This standard is satisfied when the parent demonstrates a severe mental or moral deficiency that constitutes a grave threat to the child.

***Id***. at 861 A.2d at 293-294 (citations and some quotations omitted). However, "When making this determination, we must take into consideration the express legislative policy of preservation of the family. [***See***] the Juvenile Act, 42 Pa.C.S. § 6301 *et seq.*" ***In Interest of Coast***, 561 A.2d 762, 772 (Pa.Super. 1989) (*en banc*) (citation omitted). "Therefore, the trial court is required to consider options such as structured visitation with the aid of an agency; only where there are no practicable visitation options can visitation be denied." ***Id***.

In suspending Father's visitation pending the criminal investigation, the trial court referenced both Father's actions in assisting Mother following Ju.J.'s appalling death and Father's involvement as an indicated perpetrator of sexual and physical abuse of N.F. The court stated:

There's a lot of serious allegations outstanding: one is the homicide allegation and the other one is child abuse regarding the child, [N.F.].

Those issues are open and pending and in the interest of keeping these children safe until the matters are finally resolved, there will be no visitation between the parents.

- 8 -

> Some of the reasons that would support my finding that all visitation and all contact is to be discontinued with the parents is the fact that we have those criminal matters pending.

N.T., 5/11/22, at 49-50. The court proceeded to emphasize the importance of protecting any potential testimony related to the pending matters. *Id*. at 50.

Further, in its Rule 1925(a) opinion, in support of its determination that Father posed a grave threat to S.F. and J.J., the trial court found the testimony presented by DHS to be reliable and reasoned as follows:

> This court heard credible, persuasive testimony from the DHS Supervisor and the DHS Investigator regarding the circumstances of the death of [Ju.J.], sibling of J.J. and S.F., and how [S.F. and J.J.] came to be placed under supervision. This court also heard testimony from DHS that there was an active [Child Protective Services] investigation after the December 2021 death of the child, [Ju.J.]. The outcome of that investigation was indicated for Father as perpetrator of sexual and physical abuse of the victim, N.F. This court further heard evidence of Father's prior 2007 criminal conviction of Corruption of Minors and probation sentence supervised by the Sexual Offenders Unit of the Philadelphia Department of Probation.

> This court finds the totality of the evidence presented by DHS is clear and convincing that the temporary suspension of Father's visitation is indicated to secure the safety and well-being of these children. This court finds that Father's contact with them would present a grave threat at this time.

Trial Court Opinion, 7/12/22, at 24 (cleaned up).

In arguing that the trial court erred in suspending his visitation, Father contends that the evidence does not support a finding that he was a grave threat to S.F. and J.J. *See* Father's brief at 13. Father argues:

> There was no evidence that Father posed any risk at all to J.J. . . . or S.F. There was no evidence that he neglected the

children. There was no evidence that he abused these children. There was no evidence that he knew or should have known that Mother posed any risk to the children.

*Id*. at 14 (cleaned up). Father notes the lack of any provision in an order forbidding Mother from living in the family home. *Id*. at 13. Further, he contends that the testimony regarding prior agency involvement as to Mother related to substance abuse and did not suggest any abuse to S.F. and J.J. or that Mother posed a risk to them. *Id*. at 14. As such, it follows, "[t]here was no allegation, therefore, that Father either knew or should have known that Mother posed any risk to [S.F. and J.J.], there being no evidence of any such risk." *Id*. Father further asserts that there was no evidence related to the cause of Ju.J.'s death and the contribution or responsibility of either himself or Mother. *Id*. He posits that, given their young ages, S.F. and J.J. were not going to testify regarding Ju.J.'s death rendering any concern as to their potential testimony unfounded. *Id*. at 15.

Additionally, while acknowledging the force of the indicated reports that he perpetrated sexual and physical abuse against N.F., Father maintains that this issue was not litigated at the time of the dependency adjudication. *Id*. at 14-15. He concludes:

> DHS did not present any evidence of any possible harm or negative effects that could befall [S.F. and J.J.] should Father visit with them. The trial court had alternatives to a strict prohibition of contact, even if it were concerned with [their] safety . . . during visitation. The trial court could have ordered supervised visitation. The trial court could have ordered that any contact between Father and [S.F. and J.J.] be conducted within the line of sight and line of hearing of agency personnel. A total suspension

- 10 -

of contact between Father and [S.F. and J.J.] is simply too draconian an order, especially in this case in which there was no evidence that Father harmed [them] . . . or neglected them, or posed a grave threat to them in any way.

*Id*. at 16. With this, we disagree.

The certified record supports the trial court's suspension of Father's visitation based upon the conclusion that such visitation poses a grave threat to S.F. and J.J. Father disregarded S.F.'s and J.J.'s safety and failed to appreciate the known risk posed by Mother and his court-ordered duty to prevent Mother's unsupervised access to N.F., J.J., and Ju.J. once he regained custody. That disregard of the established safety protocols contributed to Ju.J.'s death a mere two months after the court terminated its supervision.

Critically, while there was no court order explicitly prohibiting Mother from living in the family home, the certified record bears out that N.F., J.J., and Ju.J. were only reunified with Father in May 2021, after Veronica Soto, the CUA case manager, confirmed that Mother was not residing with Father. *See* N.T., 5/6/21, at 10, 23-24. Ms. Soto provided the court Mother's address and stated that she did not believe Mother was residing in the home with Father. *Id*. at 9-10. Moreover, in response to direct inquiry from Father, the court verified that Mother's visitation with the children was to be supervised. *Id*. at 25. As such, the court's May 6, 2021 order indicates Mother's separate address and provides that Father is "**to comply with not allowing Mother unsupervised visits**." Permanency Review Order (Non-Placement), 5/6/21 (emphasis added).

At the subsequent hearing on October 26, 2021, prior to terminating court supervision, Ms. Soto again reported Mother's separate address and verified that Mother was not residing with Father. *See* N.T., 10/26/21, at 7. The court's order likewise documents Mother's separate address. *See* Order for Termination of Court Supervision, 10/26/21. Moreover, Ms. Soto confirmed Father's awareness that return of the children to Mother "**would jeopardize custody of the children**." N.T., 10/26/21, at 8 (emphasis added).

Hence, any argument by Father that he should not have known that Mother posed a risk to S.F. and J.J. is wholly disingenuous. Furthermore, Father was well aware that Mother was expected to maintain separate housing, and that she was only to have supervised visits.

Notwithstanding all of the foregoing warnings and safety constraints, Father permitted Mother to reside with the family. *See* N.T., 5/11/22, at 16. Crucially, it was later determined that, prior to the reunification, Father knowingly deceived Ms. Soto and the court about Mother's separate residence. During the adjudication hearing, Ms. Johnson testified, "I found out during the investigation . . . that the family rented a room to show the judge that [Mother] was outside of the home with a different address[,] and[,] as soon as the case closed[,] [Mother] moved back in the home with Father." *Id*. at 43. As to Mother's unrestricted access to the children in the home, Ms. Crescenzo similarly testified: "When questioned, you know, about what had occurred and why Mother was back in the [home] because at the last court

hearing, it was that he had custody of the children, not Mother. He had stated to me that he could do whatever he wanted. The case was closed. . . ." *Id*. (paragraph break omitted). Ms. Johnson confirmed this response by Father. *Id*. at 42.

Additionally, following Ju.J.'s death, Father demonstrated poor insight, deceit, and a lack of cooperation with DHS that placed S.F. and J.J. in further danger by evading the agency's attempts to locate the children for three days. Even upon the eventual apprehension of Mother and Father as they were loading the car with the contents of their residence, Father not only refused to provide DHS with an explanation for Ju.J.'s death, but he also advised "Mom to be quiet when she was making statements or answering questions." *Id*. at 18, 36-38.

Finally, DHS presented evidence of the indicated reports of Father's physical and sexual abuse of N.F., as well as Father's 2007 negotiated guilty pleas for corruption of minors, statutory sexual assault, and aggravated assault. *Id*. at 28; N.T., 5/11/22, Exhibits DHS 3 and DHS 5. Although the agency was not litigating the abuse reports during the adjudicatory hearing, Ms. Crescenzo's undisputed testimony about these reports is germane to the continuing safety of S.F. and J.J. in Father's presence. Of further concern, in October 2007, Father pled guilty to charges of corruption of minors and statutory sexual assault, admitting to having "deviate sexual intercourse with the complainant . . . age 12, by placing his mouth/tongue in her vagina, and

placing his penis inside her mouth." N.T., 5/11/22, Exhibit DHS 3 at unnumbered 3.

Given the preceding evidence adduced during the adjudication hearing, DHS demonstrated by clear and convincing evidence that Father is "unfit to associate with" S.F. and J.J., and that continued visitation would pose a "grave threat" to their well-being. **See C.B.**, **supra** at 294. Therefore, the trial court did not abuse its discretion in suspending Father's visitations with those children pending the resolution of the criminal investigations. As we discern no abuse of discretion, we do not disturb the dispositional orders.

Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/9/2022