J-A13026-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: M.R., A MINOR | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: C.R., MOTHER | : : : : : : : | |
| | : | No. 31 MDA 2023 |

Appeal from the Order Entered December 6, 2022
In the Court of Common Pleas of Berks County Juvenile Division at
No(s):  CP-06-DP-0000103-2019

BEFORE:   BOWES, J., LAZARUS, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY LAZARUS, J.:        **FILED: JUNE 12, 2023**

C.R. (Mother) appeals from the trial court's order of dependency suspending her visits with her minor son, M.R. (Child) (born April 2016).[1] After careful review, we affirm.

On July 27, 2020, Berks County Children and Youth Services (CYS) filed a dependency petition regarding Child alleging lack of housing, parental mental health issues, and lack of appropriate parenting skills.[2]  Child was adjudicated dependent on August 26, 2020.  Physical and legal custody

_____

[*] Former Justice specially assigned to the Superior Court.

[1] An order suspending parental visitation is considered a collateral order, **see** Pa.R.A.P. 313, and, thus, is ripe for interlocutory appellate review.  **See In re: L.B.**, 229 A.3d 971, 976-77 (Pa. Super. 2020).

[2] Mother has a history of involvement with several county children and youth services organizations, dating back to 1998, due to lack of appropriate parenting skills, domestic violence, lack of parental supervision, and inappropriate physical discipline.

remained with Mother until October 28, 2021, when a hearing was held to transfer custody of Child to CYS. Child was ultimately placed in foster care,[3] where he remains to date. Mother was permitted to have supervised two-hour visits with Child three times per week.

At a permanency review hearing held in July 2022, three witnesses testified regarding Mother's concerning behavior in the presence of Child. Specifically, Child's therapist and two CYS visit supervisors testified that Mother:

- Instructed Child not to discuss things in his therapy sessions because he "would go to jail" and that the police are not to be trusted;

- Told Child when she was disciplining him during a visit that "they would take him away" if he continued to misbehave;

- Accused CYS and other agencies of lying about her and "putting ideas" in Child's head;

- Told Child to "tell the police everything" after she reported CYS's behaviors to the police;

- Would speak negatively about the dependency process in front of Child at visits; and

- Was having trouble with self-regulating and mental health issues, often becoming angry in sessions.

_____

[3] Foster parents requested their identifying information remain confidential and be withheld from Mother due to Mother's refusal to cooperate with CYS for the well-being and educational needs of Child. The trial judge issued an order in August 2022 granting CYS' motion to keep Child's foster parents' names and address confidential and providing that Mother could only contact Child at supervised visits. *See* Order, 8/17/22.

Trial Court Opinion, 2/6/23, at 6 n.4, 8-9 n.6.  Although Child's therapist recommended Mother's visits be suspended at that time, the trial judge declined to suspend visitation and, instead, reduced Mother's supervised visits to once every two weeks.

On November 10, 2022, CYS filed a motion to suspend Mother's visitation with Child due to a report the agency had received stating that Mother had threatened to bring a knife to the next visit with Child to kill him. CYS also received a second report that Mother had whispered to Child during a visit, "I'm going to kill you in front of your therapist."  Motion to Suspend Visitation, 11/10/22, at ¶ 8.  The motion further alleged that Child has been "extremely anxious regarding visitation and has stated on multiple occasions that he does not want to attend visits with Mother."  *Id.* at ¶ 9.  Pending a hearing on the motion, the court temporarily suspended Mother's visitation. *See* Order, 11/3/22.

On November 28, 2022, the court held a hearing[4] at which Child's trauma therapist, Andrea Karlunas, and Mother testified.  Prior to the hearing,

---

[4] Child was represented by Barbara Beringer, Esquire, who was appointed as both guardian *ad litem* and attorney for Child.  *See* 23 Pa.C.S.A. § 2313(a) (requiring trial court appoint attorney to represent child's legal interest, *i.e.*, child's preferred outcome); *but see In re Adoption of K.M.G.*, 240 A.1218 (Pa. 2020) (attorney appointed as counsel to represent child's legal interests may also serve as child's guardian *ad litem*, responsible for asserting child's best interests, so long as the child's legal interests do not conflict with attorney's view of child's best interests).

the trial judge conducted an *in camera* interview of Child,[5] by agreement of the parties and with Karlunas present.[6] ***See*** N.T. Visitation Suspension Hearing, 11/28/22, at 8-14. Child told the trial judge that he did not like seeing Mother at visits because she "grabs [his] arm" and that Mother told him that she was going to "bring a knife to [a visit with the] therapist [and that] she will kill [Child] and [his] brother[.]" ***Id.*** at 10-11. Despite telling the trial judge that Mother's threat scared him and that he is nervous when he attends visits, he indicated that he still wanted to attend the visits with Mother and wanted to see her that day in court. ***Id.*** at 11-12.

At the hearing, Karlunas testified that, as Child's therapist, she "discusses [with him] how he is feeling[,] works on feeling identification[, and] talk[s] about . . . why he's not living with [M]other at this time." ***Id.*** at 18. Karlunas testified that Child told a school counselor that during a visit with Mother around November 2022, "[M]other had whispered in [Child's] ear that she was going to kill him with a knife in [the therapist's] presence." ***Id.*** at 19. Karlunas also testified that Child does not like how Mother holds him during visits, that he is "fearful of [Mo]ther and that she is not going to be able to care for him." ***Id.*** Specifically, Karlunas testified that Child stated "when [M]o[ther] is angry or redirecting[, she] grab[s Child's] wrist or [] his

---

[5] Child was 6½-years-old at the time.

[6] The parties' attorneys were able to observe the *in camera* interview remotely via audio-video feed.

arms [and that] it makes him feel angr[y] . . and makes him feel that he's not able to express himself to [M]o[ther] to stop." *Id.* at 20.

On December 6, 2022, the trial court entered an order suspending Mother's visits with Child. In accordance with Pa.R.A.P. 1925(a)(2), Mother simultaneously filed a timely notice of appeal and concise statement of errors complained of on appeal. Mother presents the following issue for our consideration: "Did the trial court err in finding Mother presented a grave threat to [Child] such that visitation should be suspended?" Appellant's Brief, at 2.

> [T]he standard of review in dependency cases requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record . . . but does not require the appellate court to accept the lower court's inferences or conclusions of law. Accordingly, we review for an abuse of discretion.

*In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010) (citations omitted). "In dependency cases, where reunification remains the goal, parental visitation may not be denied or reduced unless visitation poses a grave threat to the child." *See In re C.J.*, 729 A.2d 89, 95 (Pa. Super. 1999).

> The "grave threat" standard is met when the **evidence clearly shows that the parent is unfit to associate with his or her children**; the parent can then be denied the right to see them. This standard is satisfied **when the parent demonstrates a severe mental or moral deficiency that constitutes a grave threat to the child.**

*In In re C.B.*, *supra* at 293-94 (emphases added) (citations and some quotations omitted). "When making this determination, we must take into consideration the express legislative policy of preservation of the family. *See*

42 Pa.C.S. § 6301(b)(1). "[T]he trial court is required to consider options such as structured visitation with the aid of an agency; only where there are no practicable visitation options can visitation be denied." *In Interest of Coast*, 561 A.2d 762, 772 (Pa. Super. 1989) (en banc) (citation omitted).

Instantly, Mother asserts that the court erred in suspending visitation where the visit reports demonstrate that there has been "a significant improvement from the [prior] reports," that Child is "well-behaved," that "[t]here are no instances of [Mother] grabbing [C]hild or using physical discipline," and that Child "doesn't regulate his [own] behaviors." Appellant's Brief, at 8. Finally, Mother contends that CYS did not prove "how continued visitation proves a grave threat to [C]hild" where Karlunas never "explain[ed] why or how [Child] is fearful [of Mother, and t]here is no discussion about [any] long-term psychological impact on [C]hild." *Id.*

While the visitation reports may not document Mother's concerning behavior, the reality is that supervisors are not able to memorialize everything that happens between a parent and child during a visit. Less than one month prior to the court suspending Mother's visits, Mother allegedly whispered to Child that she was going to bring a knife to the next visit and use it to kill him in front of his therapist. Although Mother denied any allegations lodged against her with regard to her threatening behaviors toward Child, the trial judge "found Mother's testimony in this regard incredible in the entirety." Trial Court Opinion, 2/6/23, at 7. Child corroborated Mother's death threat to the trial judge at an *in camera* interview. *See* N.T. Visitation Suspension Hearing,

11/28/22, at 11. Not coincidentally, Child's therapist testified that Child is noticeably less anxious since visits have ceased. *See id.* at 26.

Moreover, at a July 2022 permanency review hearing, at least three individuals testified that Mother was exhibiting erratic and concerning behavior around Child during visits. In addition, Child's therapist testified that on October 26, 2022, Mother had appeared outside of the facility where the therapist meets with Child for therapy sessions, despite being told not to have contact with Child other than at supervised visits. Significantly, the court recounted:

> Mother stood outside the building, across the street, watching the Child enter the building and she locked eyes with [] Karlunas. [] Karlunas said Mother was staring at her, standing outside a black vehicle with a red duffle bag on the ground in front of her. [] Karlunas said Mother was not informed of the session as she did not have custody. Because of Mother's behavior, [] Karlunas's facility secured its doors to prevent public entry. On cross-examination, [] Karlunas conceded Mother did not verbalize any threats, but this did little to temp[er] Karlunas's concerns regarding the state of Mother's mental health and emotional dysregulation.
>
> *          *          *
>
> On re-direct, [] Karlunas explained that Mother appearing outside her facility was clinically significant because, when someone has been told not to come to the facility or surveil a child, it indicates that such a person cannot honor externally implemented behavioral or safety measures. [] Karlunas said specifically in the matter at hand, Mother was aware she was not to be attending the sessions and was not to be on the property (at the direction of the facility's executive director). Instead of honoring these restrictions, [] Karlunas said [] Mother chose not to honor the spirit of the instructions and instead "c[a]me up right to the edge of violating that boundary."

Trial Court Opinion, 2/6/23, at 6-7.[7] In fact, even the trial judge noted that "on more than one occasion, [Mother] lingered in the courtroom after a proceeding and stared down the undersigned judge [and s]he has even shown up on days not scheduled for court trying to gain access to the judge." *Id.* at 8. To classify Mother's behavior as erratic and deeply disturbing is an understatement. *See* N.T. Visitation Suspension Hearing, 11/28/22, at 32 (Child's therapist testifying, "it is also clinically significant that [Child] fears his mother and that is a concern at this time").

Following the November 2022 hearing, the court concluded that Mother posed a grave threat to Child due to Mother's mental health issues and emotional dysregulation, her violent behaviors when redirecting Child during visits, and inappropriate actions, not the least of which was the death threat she made to Child during a recent visit. To quote the trial judge, "as of the time of the [h]earing . . . Mother's words and actions clearly and convincingly demonstrated a severe mental or moral deficiency constituting a grave threat to [] Child." Trial Court's Opinion, 2/6/23, at 9. *See also In re C.J.*, *supra*.

Because the trial court's findings of fact and credibility determinations are supported by the record, we conclude that the trial court did not abuse its discretion in ordering the suspension of Mother's visits with Child. *In re*

---

[7] The trial judge noted in his opinion that he "personally witnessed Mother's unflinching glare where she attempted to lock eyes without breaking her gaze in what appeared to be an effort to intimidate or otherwise show her dissatisfaction with the [c]ourt." Trial Court Opinion, 2/6/23, at 8 n.5.

***R.J.T.***, ***supra***.[8]  CYS demonstrated, by clear and convincing evidence, that Mother is "unfit to associate with Child."  ***See In re C.B.***, ***supra*** at 294.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/12/2023

_____

[8] We note that the suspension of visits is not necessarily permanent.  In fact, the trial judge stated that if Mother complies with court-ordered services, including receiving mental health treatment, cooperates with CYS partners, and moderates her behaviors, the trial court would be inclined to revisit its decision and potentially reinstate visitation.  ***See*** Trial Court Opinion, 2/6/23, at 9.  ***See also id.*** ("As such, the [t]rial [c]ourt entered its [o]rder suspending Mother's visitations with Child, **pending application to the [c]ourt for resumption with proof to satisfy Mother no longer constitutes a grave threat**.") (emphasis added).